**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **JESSIE HOFFMAN** | * | **CIVIL ACTION NO. 12-796** |
| **VERSUS** | * | **JUDGE JAMES BRADY** |
| **BURL CAIN ET AL.** | * | **MAG. JUDGE STEPHEN RIEDLINGER** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

<u>**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**</u>

**MAY IT PLEASE THE COURT:**

**1.    BACKGROUND**

On December 20, 2012, Jessie Hoffman instituted this action against Governor Bobby Jindal, Secretary James D. LeBlanc, Warden Burl Cain, Assistant Warden Angelia Norwood and the State of Louisiana through the Department of Public Safety and Corrections. [Doc. 1.] On January 23, 2013, Christopher Sepulvado filed a motion to intervene which was subsequently granted. [Docs. 11, 26.]

Hoffman and Sepulvado's initial complaints were substantially identical. Both claimed that they had not been provided in advance with Louisiana's execution protocol in violation of their due process rights. Furthermore, they contended that Louisiana has no valid protocols by which to conduct executions, because sodium thiopental –the first of the three drugs previously used to conduct executions – was unavailable and that executing them under the 2010 version of the protocols or any revised version thereof would subject them to unnecessary pain and suffering in violation of the 8th Amendment.

This Court granted Sepulvado's motion for preliminary injunction and stayed his imminent execution on the basis that "[f]undamental fairness requires that [Sepulvado] be given meaningful and adequate notice of how his rights have been affected by the changes in the execution protocol. Sepulvado is entitled to review the full protocol itself." [Doc. 28, pg. 3.] On August 30, 2013, however, the U.S. Fifth Circuit unanimously reversed, stating that "no appellate court has recognized the due-process claim on which the district court *a quo* granted relief; we decline to be the first." *Sepulvado v. Jindal*, 13-70007, --- F.3d ---, 2013 WL 4711679 (5th Cir. 8/30/13).

In the interim, this Court considered the Motion to Dismiss filed by all defendants in response to the original complaints. On April 16, 2013, this Court granted the Motion to Dismiss in part, dismissing Governor Jindal and DPSC, as well as all monetary damages, because Hoffman and Sepulvado did not allege any physical injury. [Doc. 59.]

On June 5, 2013, Magistrate Judge Riedlinger ordered Defendants to produce lethal injection protocols, which were subsequently provided. Once in receipt of these protocols, Hoffman and Sepulvado amended their complaints. [Doc. 67.] The amended Compaint is replete with legal conclusions, yet is devoid of any facts to support such conclusions, ***despite the fact that both Hoffman and Sepulvado have been provided with Louisiana's complete execution protocol.***

In their amended Complaint, Hoffman and Sepulvado name as defendants Secretary James LeBlanc, Warden Burl Cain, and Assistant Warden Angelia Norwood, in their individual

and official capacities.   [Doc. 67, pars. 5-7.][1] They assert that their due process rights, 8th Amendment rights, right to access to the courts, and equal protection rights have been violated by the method in which the State proposes to execute them.   They seek declaratory, injunctive, and monetary pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201.[2]

As explained in more detail below, Hoffman and Sepulvado's amended Complaint fails to state a claim upon which relief may be granted.

## 2.      LAW AND ARGUMENT

### A. Rule 12(b)(6) Standard.

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 127 S.Ct 1955, 550 U.S. 544, at 547 (2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. The factual allegations must "raise a reasonable expectation that discovery will reveal evidence" of liability. *Twombly,* 550 U.S. at 556.   "A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff."  *Lormand v. U.S. Unwired, Inc.,* 565 F .3d 228, 232-33 (5th Cir.2009); *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir.1996). The court is not, however, bound to accept as true legal conclusions couched as factual allegations.

---

[1] While they also named unknown John Does, those individuals have been neither identified nor served.

[2] They also purport to bring their complaint pursuant to 18 U.S.C. § 3599, which authorizes the appointment of an attorney or other expert for defendants in criminal actions who are unable to afford such services.  Because this is not a criminal case, this statute has no application.

*Iqbal,* 129 S.Ct. at 149-50; *Anderson v. Law Firm of Shorty Dooley & Hall,* 2009 WL 3837550, 2 (E.D.La. 2009). The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Twombly,* at 557, 127 S.Ct. 1955 (brackets omitted).

The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Twombley,* at 555, 127 S.Ct. 1955. Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. *Iqbal,* 129 S.Ct. at 1949-1950.

Furthermore, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Twombley,* at 556, 127 S.Ct. 1955. Determining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. *Iqbal,* 129 S.Ct. at 1950. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief." Fed. R. Civ. Proc. 8(a)(2).

**B. Due Process Claims.**

Hoffman and Sepulvado claim that they have a due process right to notice of the procedures to be used at their execution, including an opportunity to review the execution protocol and lodge any legal objections. [Doc. 67, pgs. 19-20.] They contend that Defendants violated these rights by refusing to disclose the protocol and by previously amending the protocols as long as a month prior to an execution. [Doc. 67, pgs. 19-20.] They further contend that executing them pursuant to a new protocol with insufficient time to review the protocol violates their rights [Doc. 67, par. 10], that they are entitled to a certified copy of the applicable protocol within six months before a scheduled execution [Doc. 67, par. 11], and that Defendants must notify them of any change in the protocol [Doc. 67, par. 11].

In reversing Sepuvaldo's preliminary injunction and vacating the stay of his execution, the U.S. Fifth Circuit in this very case found that Sepulvado was not likely to prevail on his claim that the due process clause entitles him to prompt and detailed disclosure of Louisiana's most recent execution protocol. Instead, the unanimous Court stated that "[t]here is no violation of the Due Process Clause from the uncertainty that Louisiana has imposed on Sepulvado by withholding the details of its execution protocol." *Sepulvado,* 2013 WL 4711679, * 4. In fact, the Fifth Circuit expressly rejected the argument that "an inmate who is to be executed cannot challenge a protocol as violative of the 8th Amendment until he knows what that protocol contains." *Id.* Instead, the Court stated that adopting such reasoning "would frustrate the State's significant interest in enforcing its criminal judgments. Courts are not supposed to function as boards of inquiry charged with determining best practices." *Id.* (Internal citations omitted.)

Because no other appellate court has recognized such a due process claim, and in fact were rejected by the Ninth Circuit in *Beaty v. Brewer,* 649 F.3d 1071 (9th Cir. 2011) and by the Eleventh Circuit in *Powell v. Thomas,* 643 F.3d 1300 (11th Cir. 2011), the Fifth Circuit reversed the preliminary injunction and stay.

The due process claims raised in the amended Complaint are the same as those rejected by the Fifth Circuit. The assertions that these individuals are entitled to at a certified copy of the applicable protocol at least six months before the execution in order to lodge any objections and must be notified of all future changes runs counter to the Fifth Circuit's reasoning in *Sepuvlado.* Further, the suggestion that amending a protocol within a month prior to an execution violates their constitutional rights is another way of saying that they are entitled to notice of the protocols sufficiently in advance of the execution, which was denounced by the Fifth Circuit for lack of legal authority.

Even assuming all facts in the amended complaints are true, the law affords no remedy to either Hoffman or Sepulvado, as inmates scheduled to be executed have no right to the know the details of the execution. Because Section 1983 is not a source of substantive rights, the first step in any such claim is to identify the specific constitutional right infringed. *Albright v. Oliver,* 510 U.S. 266, 271 (1994). Absent such constitutional right, a Section 1983 claim must fail. Because the Fifth Circuit has recently repudiated these claims, Defendants submit that the due process claims asserted by Hoffman and Sepulvado must be dismissed.

## C. Access to the Courts.

While prisoners have a constitutional right of access to the courts that is adequate, effective, and meaningful, *Turner v. Epps,* 460 F.App'x. 332, 327 (5th Cir. 2012), *cert. denied,* 132, 1306, 181 L.Ed.2d 1035 (2012), however, this right "guarantees no particular methodology but rather the conferral of a capability—the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts." *Turner,* citing *Lewis v. Casey,* 518 U.S. 343, 354, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Thus, an inmate who brings a § 1983 claim based on his right of access to the courts must be able to show that the infringing act somehow ***defeated his ability to pursue a legal claim***. *Id.* (Emphasis supplied.) He must show that he incurred an actual injury in order to prevail on a denial of access claim. *Id.* The right of access does not create "an abstract, freestanding right," but exists to vindicate other rights. *Id.*

Taking all allegations as true, Hoffman and Sepulvado assert that because attorney visits must end by 3:00 p.m. on the day of an execution [Doc. 67, par. 84], "there is no way to ensure that the execution protocol is carried out as directed" [Doc. 67, par 85] or "to confirm that the condemned inmate did not suffer pain and suffering while conscious" [Doc. 67, par. 86]. What they do not allege is that somehow their access to courts is inhibited, a prerequisite to a viable access to courts claim. Instead, they claim that by not allowing a lawyer present "in the execution chamber" to confirm the manner of the execution itself, they may suffer unnecessarily. Stated another way, they are claiming that, in order to ensure that no 8th Amendment violation occurs, counsel must be allowed to be present in the execution room. However, the assertion of necessity does not substitute for an identification of a cognizable interest. *Sepulvado,* 2013 WL

4711679, *4.  Failure to identify how the actions of Defendants infringe on their ability to pursue a legal claim is fatal to their contention.  In fact, they assert that Defendants' action limits their lawyers' ability to confirm that their execution is not cruel and unusual, not that Defendants' action defeats their ability to pursue a legal claim.  Thus, even if all facts are true, they have no cognizable access to the court claim.

### D. Equal Protection.

To state an equal protection claim, a plaintiff must show that the State will treat him disparately from other similarly situated persons.  *Ferguson v. Warden, Florida State Prison,* 493 Fed.Appx. 22, 25-26 (11th Cir. 2012); *Arthur v. Thomas,* 674 F.3d 1257, 1262 (11th Cir. 2012).  If a law treats individuals differently on the basis of a suspect classification or impinges upon a fundamental right, it is subject to strict scrutiny.  *Id.*  Otherwise, a plaintiff must show that disparate treatment is not rationally related to a legitimate government interest.  *Id.*

Hoffman and Sepulvado claim that "Defendants have, and will, materially deviate from any purported written execution protocol." [Doc. 67, p. 20.]  They cite no facts to support such a legal conclusion, only conclusory allegations couched as facts.  They simply state that "the purported protocol will not be carried out in accordance with the written instruments, or will be administered in such a way that fails to adequately safeguard Plaintiffs' rights" [Doc. 67, par 62] and that "[t]he protocols are not adequately specific, and as such the execution may be carried out in different manners each time" [Doc. 67, par. 75].  Nowhere in the complaint are any facts alleged that would support such statements, despite having ample time to review Louisiana's protocols.

Execution protocols where all death row inmates receive the same drugs and are subject to the same procedures fall short of establishing an equal protection claim. *Ferguson, supra; Pardo v. Palmer,* 500 Fed.Appx. 901, 905 (11th Cir. 2012).

While factual allegations that a state has substantially and materially deviated from its own protocols may constitute a viable equal protection claim, such is not the case here. There are no facts which even suggest that Louisiana has failed to follow its protocol or applied it inconsistently in the past. While the Eleventh Circuit in *Arthur v. Thomas,* 674 F.3d 1257 (11th Cir. 2012) found that an Alabama death row inmate alleged sufficient facts to constitute an equal protection claim, that inmate had specific evidence that Alabama failed to perform a consciousness test during a 2011 execution of another Alabama inmate. However, even the *Arthur* court acknowledged that a plaintiff may not rely upon prior execution in other states to support his claim. See, *Arthur,* 674 F.3d at 1262. Allegations of botched executions in other states are the only purported "facts" presented by Hoffman and Sepulvado in their amended Complaint. Thus, other states' problematic executions cannot be used to bolster the instant complaint.

In this case, there are no facts that Louisiana in prior executions deviated in any way, much less a material aspect, from its written protocol. Absent such factual allegations, Hoffman and Sepulvado's equal protection claim is based on only speculation which does not meet the *Twombly* standard and must be dismissed.

**E. 8th Amendment Claims.**

The seminar case from the United States Supreme Court regarding cruel and unusual death sentences is *Baze v. Rees,* 553 U.S. 35, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008).  It is well-settled that capital punishment is constitutional.  *Baze,* at 47.  Because some risk of pain is inherent in even the most humane execution method, if only from the prospect of error in following the required procedure, the Constitution does not demand the avoidance of all risk of pain.  *Baze,* at 47.  To constitute cruel and unusual punishment, an execution method must present a "substantial" or "objectively intolerable" degree of serious harm.  *Baze,* at 35-36.  Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of "objectively intolerable risk of harm" that qualifies as cruel and unusual.  *Baze,* at 50.

Furthermore, allowing a condemned prisoner to challenge a State's execution method merely by showing a slightly or marginally safer alternative finds no support in the Supreme Court's cases.  *Baze,* at 51.  The Supreme Court does not allow courts to turn into boards of inquiry based on "best practices" for executions.  *Baze,* at 15.  Furthermore, the Supreme Court has never invalidated a State's chosen procedure for carrying out a death sentence as cruel and unusual.  *Baze,* at 48.

In *Baze,* the Court explicitly approved Kentucky's three-drug protocol, but, as the Fifth Circuit has noted, "a one drug protocol [is] also acceptable under the flexible *Baze* standard." *Sepulvado, supra,* citing *Thorson v. Epps,* 701 F.3d 444, 447 n. 3 (5th Cir.2012).  Other federal courts of appeals agree that pentobarbital-only protocols comport with the Eighth Amendment's

prohibition against cruel and unusual punishment.  See, *Towery v. Brewer,* 672 F.3d 650 (9th Cir. 2012); *Cooey v. Strickland,* 589 F.3d 210 (6th Cir. 2009).  In fact, the *losing plaintiffs* in *Baze* urged Kentucky to do what Louisiana has done - adopt a one-drug protocol that dispenses with the use of pancuronium and potassium chloride.  *Sepulvado,* 2013 WL 4711679, *2.  (Emphasis in original.)

While "[r]easonable people of good faith disagree on the morality and efficacy of capital punishment, and for many who oppose it, no method of execution would ever be acceptable," *Baze,* at 61, courts must "be on guard against finding in personal disapproval a reflection of more or less prevailing condemnation." *Id.*  A state's efforts to implement capital punishment must certainly comply with the Eighth Amendment, but what that Amendment prohibits is wanton exposure to "objectively intolerable risk," not simply the possibility of pain.  *Id* at 61-62.  Further, an inmate cannot succeed on an 8th Amendment claim by simply showing one more step a state could take as a failsafe for other, independently adequate measures.  *Id* at 61.

Permitting constitutional challenges to lethal injection protocols based on speculative injuries and the possibility of negligent administration is not only unsupported by Supreme Court precedent but is also beyond the scope of a court's judicial authority. *Cooey,* 589 F.3d at 225. **The purpose of the Eighth Amendment "is not to substitute the court's judgment of best practices for each detailed step in the procedure for that of corrections officials."**  *Id.* (Emphasis supplied.)

The 8th Amendment challenges made in this amended Complaint fall into six categories: 1. the protocols were not promulgated or examined by a medical professional [Doc. 67, pars. 57-

59]; 2. the protocols do not include adequate safeguards and/or are not adequately specific [Doc. 67, pars. 63, 75, 77-78], 3. pentobarbital will be ineffectively delivered and/or will be cause serious harm [Doc. 67, pars. 40, 65]; 4. the execution will not be carried out by qualified medical professionals and those individuals have inadequate training [Doc. 67, pars. 66-68, 72, 71, 76, 79, 81]; 5. the drugs have expired or not been stored properly [Doc. 67, pars. 69-70]; and 6. inadequate testing of the execution equipment [Doc. 67, pars. 73-74].  Almost all of these allegations are made "upon information and belief."  As noted by the Fifth Circuit, these allegations are nothing more than "an attempted constitutionalization of the planned regimen for practice by staff, with nothing but guessing that staff lack the judgment and skill to administer the pentobarbital." *Sepulvado,* 2013 WL 4711679, FN 14, citing *Beaty v. Brewer,* 791 F.Supp.2d 678, 686 (D. Ariz. 2011), *aff'd* 649 F.3d 1071 (9th Cir. 2011).

The Fifth Circuit in *Raby* and *Thorson* recently rejected such speculative allegations.  The plaintiff in *Raby v. Livingston,* 600 F.3d 552 (5th Cir. 2010) made claims that there could possibly be a risk of problems with insertion of IV, that IV lines were not properly monitored during administration of lethal drugs, that the protocol did not provide for sufficient monitoring of inmate's appearance and that minor inconsistencies between protocol and practice may have caused cruel and unusual punishment. The Court stated that these possible risks did not rise to the level of cruel and unusual punishment.  Similarly, the plaintiff in *Thorson* alleged that Mississippi's lethal injection protocol does not expressly require medical training for members of the execution team; there is no contingency plan for problematic IV access; sedation of the prisoner is inadequately monitored; there is no description of drug administration after IV

placement; the protocol deviates from acceptable anesthesiology standards; and potential drug interaction issues are not addressed.  The Court likewise found that these possible risks did not rise to the level of cruel and unusual punishment.

    1.  No Constitutional Requirement that Protocols Be Examined or Promulgated by Medical Professionals.  Even assuming that the allegations that Louisiana's protocols were adopted without the input of a medical professional are correct, there is no connection between the creation of the protocols and the presence of "an objectively intolerable risk," necessary to assert a viable 8th Amendment claim.  *See, Richardson v. Johnson,* 248 F.3d 1149 (5th Cir. 2001) (lack of evidence to prove connection between absence of written protocols and decreased risk of pain and suffering was fatal to inmates' claim.)    On the contrary, courts nationwide have continually rejected the argument that the presence of medical personnel is constitutionally-mandated.  See, *Baze*, *supra* (the use of laypersons to calculate and mix doses of drugs does not rise to a risk of improper administration, monitoring of IV line by warden and deputy warden not improper, and no necessity of medical professional to employ special equipment to verify that inmate is unconscious); *Cooey, supra* (fact that physicians were not employed to implement execution did not matter; requirement that execution team have at least one year experience as medical assistant, phlebotomist, or EMT was sufficient); *Workman v. Bredesen,* 486 F.3d 896, 909 (6th Cir. 2007) (fact that employees of corrections department, rather than doctors or anesthesiologist, performed execution procedure is of no constitutional moment; in fact, a

physician is required to be on site.)[3]; and *Ferguson,* 493 Fed.Appx. at 25 ("if-then" hypotheticals concerning lack of training by execution team falls short of pointing to an "objectively intolerable risk"). Mere conjecture does not qualify as an objectively intolerable risk. *Thorson,* 701 F.3d at 447.

2. Speculation that the Protocols Do Not Provide Adequate Safeguards Is Not Enough And/Or Is Not Specific. Hoffman and Sepulvado state in a conclusory fashion that Louisiana's protocols do not provide sufficient safeguards. However, they fail to state in what manner the protocols are deficient. Particularly, what step is missing from Louisiana's Protocols that would amount to decreased pain and suffering during an execution? This Court should not accept conclusion couched as factual allegations. *Iqbal, supra.* See also, *Clemons v. Crawford,* 585 F.3d 1119, 1127-1128 (8th Cir. 2009) (repeated use of terms "incompetent," "unfit," "untrained," or "unqualified" without any factual allegation to support such claims is insufficient.)

Furthermore, the Fifth Circuit in *Raby* and *Thorson* has stated that conclusory allegations of inadequate safeguards are insufficient to state an 8th Amendment claim. The Fifth Circuit in *Thorson* explicitly stated that "Thorson's ultimate argument is that Mississippi's failure to dictate every execution detail in writing *could* cause a constitutional problem. That misses the point. He has adduced no evidence that requiring the State to expound further on what is already written, along with what is already being done, will in fact significantly reduce a substantial risk of severe pain." *Thorson,* 701 F.3d at 448-449.

---

[3] Just as in *Workman*, Louisiana's statute mandates that a physician be present at all executions. La. R.S. 15:570(A)(3).

14

3. No Evidence That Pentobarbital Will Be Ineffectively Delivered And/Or Will Cause Serious Harm.  Hoffman and Sepulvado state that "[t]here is a reasonable likelihood that pentobarbital will be ineffectively delivered."   [Doc. 67, par. 65.]   They also claim that pentobarbital is not "rapid-acting" like sodium thiopental.  [Doc. 67, par. 39.] "Pentobarbital alone will likely cause serious harm to the condemned inmate."  [Doc. 67, par 40.]

It cannot be that pentobarbital is ineffective to cause death.  As recently acknowledged by the Fifth Circuit in this case, "a one drug protocol [is] also acceptable under the flexible *Baze* standard."  *Sepulvado,* 2013 WL 4711679, *2, citing *Thorson v. Epps,* 701 F.3d 444, 447 n. 3 (5th Cir.2012).  Further, at least two other federal courts of appeals agree that pentobarbital-only protocols comport with the Eighth Amendment's prohibition against cruel and unusual punishment.  *Cooey, supra; Towery, supra.*  Indeed, the plaintiffs in *Baze* sought a one-drug protocol, such as the one Louisiana now employs:

 "Much of petitioners' case rests on the contention that they have identified a significant risk of harm that can be eliminated by adopting alternative procedures, such as ***a one-drug protocol*** that dispenses with the use of pancuronium and potassium chloride"

*Baze,* at 51, (emphasis supplied) and

"First, petitioners contend that Kentucky could switch from a three-drug protocol to a one-drug protocol by using a single dose of sodium thiopental or other barbiturate [such as pentobarbital]."

*Baze,* at 56.  Numerous death penalty inmates in Idaho, Florida, and Tennessee also argued for a one-drug combination instead of a three-drug one.  See, *Roades v. Reinke,* 671 F.3d 856 (9th Cir. 11/16/11); *Roades v. Reinke,* 830 F.Supp.2d 1046 (9th Cir. 11/14/11); *Creech v. Reinke*, 2012 WL 1995085 (D. Idaho 6/5/12); *Pardo v. Palmer,* 500 Fed.Appx. at 904; and *Harbison v. Little,*

571 F.3d 531 (6th Cir. 2009).  Furthermore, the claim that pentobarbital is not as fast acting has

already been rejected by a federal appellate court.  *Mann v. Palmer,* 713 F.3d 1306, 1315 (11th

Cir. 2013).

      Additionally, medical evidence supports the conclusion that the one-drug procedure is

more humane than the approved-three-drug combination.   In *Dickens v. Brewer,* 2009 WL

1904294 (D. Ariz. 7/1/2009), the court discussed the effects of replacing the three-drug to a one-

drug of either pentobarbital or sodium thiopental:

> "Replacing the three-drug protocol with a one-drug protocol using pentobarbital or
> sodium thiopental would eliminate the risk of severe pain from pancuronium bromide and
> potassium chloride. ***Five grams*** of sodium thiopental alone will cause death to almost
> everyone within a number of minutes, but it may take thirty to forty-five minutes for the
> death to be indicated by a flat line on an EKG. Pentobarbital acts as rapidly as sodium
> thiopental, and it is eliminated from the brain more slowly than sodium thiopental and
> causes death more predictably. When pentobarbital is given intravenously in a large dose
> (three to four times its anesthetic dose), loss of consciousness, cessation of breathing, and
> stoppage of the heart occur ***in less than two minutes***."

*Dickens v. Brewer*, 2009 WL 1904294 (D.Ariz. 7/1/09) *affirmed,* 631 F.3d 1139 (9th Cir. 2011).

The Third Circuit in *Jackson* stated:

> "Pentobarbital is a barbiturate commonly used to euthanize terminally ill patients who
> seek death with dignity in states such as Oregon and Washington. It has been used
> successfully for executions in at least four other states, and there is no evidence that it
> fails to render an inmate unconscious. The District Court did not abuse its discretion in
> finding that the use of pentobarbital did not create "a demonstrated risk of severe pain, as
> required by the Supreme Court."

*Jackson,* 656 F.3d at 165.  Finally, inmates' own expert in *Cooey* congratulated Ohio for moving

forward to a one-drug combination.  *Cooey,* 589 F.3d at 215.

The only other possible attack that can be made as to the use of pentobarbital is that it is unconstitutional as administered. The Supreme Court in *Baze* likewise stated:

> "Petitioners agree that, if administered as intended, that procedure will result in a painless death. The risks of maladministration they have suggested—such as improper mixing of chemicals and improper setting of IVs by trained and experienced personnel—cannot remotely be characterized as "objectively intolerable."

*Baze,* at 62. As Hoffman and Sepulvado have been supplied with Louisiana's current protocol, there is no reason why they cannot articulate supposed problems with Louisiana's particular method. However, there is not a single fact in the amended Complaint to suggest that pentobarbital will not be effectively administered by Louisiana. Again, Hoffman and Sepulvado can only engage in speculation "that staff lack the judgment and skill to administer the pentobarbital." *Sepulvado,* FN 14.

4. Complaint That The Execution Will Not Be Carried Out By Qualified Medical Professionals And Those Individuals Have Inadequate Training. Once again Hoffman and Sepulvado continue to make unsubstantiated conclusory argument completely devoid of supporting facts. This time they contend that the execution team is inadequately trained and are not "qualified medical professionals." As explained earlier, the assertion that "qualified medical professionals" are mandated by the Constitution has been rejected again and again. See, *Thorson,* 701 F.3d at 447, citing *Kelly v. Lynaugh,* 862 F.2d 1126, 1135 (5th Cir. 1988) (employing only trained professional to administer the drugs is not required by the Constitution or Fifth Circuit precedent); *Baze*, at 54-60; *Cooey,* 589 F.3d at 226 (fact that physicians were not employed to implement execution did not matter; requirement that execution team have at least

one year experience as medical assistant, phlebotomist, and EMT was sufficient); *Workman,* 486 F.3d at 909*;* and *Ferguson,* 493 Fed.Appx. at 25 ("if-then" hypotheticals concerning lack of training by execution team falls short of pointing to an "objectively intolerable risk").

Notably, what Hoffman and Sepulvado fail to include in their amended Complaint is that Louisiana's protocol mandates that the execution team be at least as qualified as those approved in the cases cited above.  These inmates can point to no facts that indicate the training required of the execution team members is likely to cause unnecessary risk of pain.

5. No Evidence that Louisiana Will Used Drugs That Have Expired Or Have Not Been Stored Properly.  The inmates next assert that the drugs to be used in executions are expired and/or have been improperly stored.  There are absolutely no facts in the amended Complaint to support the conclusion that Defendants will improperly store any drugs. The only facts that support a conclusion that expired drugs will be used is the statement that "Danish pharmaceutical company Lundbeck announced that it would stop shipping pentobarbital to American prisons that carry out the death penalty by lethal injection." [Doc. 67, par. 26].  This is not the first time a death row inmate has attempted to make such a claim, always unsuccessfully.

In *Creech v. Reinke*, 2012 WL 1995085 (D. Idaho 2012), a death row inmate argued that Idaho would use adulterated, illegally-obtained, and/or expired drugs because the Indian manufacturer stopped manufacturing pentobarbital.  This, the inmate, argued showed that there was a substantial risk he would suffer pain while being executed.   The court disagreed, stating that the inmate did not bring "forward sufficient facts to show that, even if an expired, foreign-manufactured dosage of pentobarbital is used, he is at substantial risk of suffering severe pain

during execution." *Creech,* at *21. The court went on to discuss similar claims made around the

country, which were likewise rejected:

> "In *Cook v. Brewer,* the Ninth Circuit determined that a complaint cannot merely
> speculate and make general claims about every drug produced outside of the country. In
> his appeal from the court's granting of Defendant's motion to dismiss, Cook argued that
> using a foreign manufactured drug that was not approved by the FDA created a
> "substantial and unnecessary risk of unconstitutional pain." His support for this claim
> included allegations that the drug was obtained in violation of federal law, that a foreign-
> manufactured drug may not be effective and could be contaminated or compromised, and
> that drugs from foreign countries do not have the same quality and safety assurance as
> those regulated by the FDA.
>
> In its holding, the Ninth Circuit stated that "plaintiffs must make specific allegations
> about the manufacturing process, formulation, potency, quality, or labeling of the drug at
> issue" in the particular case. ***Because Cook's claims were merely speculations about the***
> ***possibilities of unsafe foreign-manufactured drugs, and not factual claims about the***
> ***specific drug being used for his own execution, the court found that he did not have***
> ***enough to survive the motion to dismiss***. …
>
> Likewise, in *Brewer v. Landrigan,* [131 S.Ct. 445 (2010)] the Supreme Court held that a
> court cannot be left to speculate whether the drug will cause severe pain and suffering.
> Before reaching the Supreme Court, Brewer's Motion for a Temporary Restraining Order
> was granted by the United States District Court for the District of Arizona. The district
> court found that the plaintiff was likely to succeed on the merits, partly because the
> defendants failed to provide important information about the origins and efficacy of the
> drug. Without the information, the court was "unable to determine whether the drug was
> produced by a foreign company that follows standard operating procedures for the drug's
> manufacture or that has no history of contamination in manufacturing the product."
> Consequently, the court accepted the plaintiff's showing that "such drugs are likely to
> contain harmful contaminants," and therefore found the plaintiff was likely to succeed in
> showing there was a substantial risk in administering the drug. The Ninth Circuit
> affirmed in *Landrigan v. Brewer,* 625 F.3d 1144 (9th Cir.2010).
>
> However, the United States Supreme Court reversed, vacating the district court's
> decision, because it found that "***speculation cannot substitute for evidence that the drug***
> ***is sure or very likely to cause serious illness and needless suffering***." Absent a showing
> that a drug is illegally obtained or proof to support such a claim, the claim will not be
> likely to succeed on the merits. ***The Court emphasized that district courts cannot be left***
> ***to make determinations based on speculation and conclusory allegations that are***

> *unsupported by facts specific to the drug being used in the execution at issue in each case."*

*Creech,* at *21-22.  (Internal citations omitted.)  (Emphasis supplied.)  The *Creech* court rejected the unsubstantiated inference that there is no source for the drugs and that foreign-manufactured drugs maybe not be effective, stating that this does not meet the "plausibility" standard necessary to survive a motion to dismiss.

The same result was reached by the Eleventh Circuit in *Mann, supra.*  There the inmate alleged that Florida lacked a safe, current, or adequate supply of pentobarbital.  While the Court accepted as true that Lundbeck required that its purchasers not to make the drug available for executions and not to redistribute the drug without authorization from Lundback, it refused to accept "allegations 'upon information and belief' that the supply of pentobarbital possessed by Florida" is expired or illegally obtained.  *Mann,* 713 F.3d at 1315.

Just like the plaintiffs in *Cook, Brewer, Creech,* and *Mann*, Hoffman and Sepulvado are armed with no facts about the efficacy of the drugs to be used by Louisiana, only speculation and inferences.  Simply because a manufacturer has allegedly stated it will stop shipping pentobarbital to prisons does not demand the leap of logic that Hoffman and Sepulvado would have this Court make.  As revealed by *Brewer,* 131 S.Ct. 445 (2010), to assume a drug is unsafe without adequate proof is reversible error.[4]

---

[4] The Florida Supreme Court came to the same conclusion in *Valle v. State,* 70 So.3d 530 (2011).  There too an inmate attempted to rely on letters from Lundbeck manufacturer asking prisons to no longer use its drug for executions and that it could not be sure the safety of the drugs in such circumstances.  The Supreme Court found that these letters were irrelevant – the manufacturer's opposition to the use of the drug in an execution has no bearing on the question of whether an execution posed a substantial risk of harm.  In coming to this conclusion, the Florida Supreme Court relief upon two prior consistent decision –

Furthermore, Hoffman and Sepulvado fail to explain how potentially expired or illegally-obtained drugs equate to harm during an execution.  As noted by the *Creech* court, the plaintiff must still establish the link between the questionable drug and serious harm during an execution.  *Creech,* at *22.  The amended Complaint is devoid of any facts that would allow this Court to make the requisite link.  As such, Hoffman and Sepulvado have failed to state a plausible claim for relief.

6. Complaint of Inadequate Testing Of Execution Equipment.  Equally as unsubstantiated is the claim that the execution equipment has not been tested since the last execution in 2010 and therefore will fail.  This is nothing more than conclusory allegations backed with no factual evidence.  For this reason, this allegation cannot stand.  See, *Brewer v. Landrigan,* 131 S.Ct. 445 (2010).

Nor has any court nationwide found an 8th Amendment violation because of inadequate testing of equipment.  These allegations are nothing more than conclusions and do not rise ot the level of a plausible claim for relief.

**F. Defendants In Their Individual Capacities Are Entitled to Qualified Immunity.**

The qualified immunity defense available to official sued in their individual capacities is a familiar one and operates to protect a public official who is performing a discretionary task. *Hale v. Townley,* 45 F.3d 914 (5th Cir. 1995).  The Courts have traditionally used the two step method in determining whether a defendant is entitled to qualified immunity.  The first step in

---

*West v. Brewer*, 2011 WL 2836754 (D. Ariz. 2011), *aff'd,* 652 F.3d 1060 (9th Cir. 2011) and *Powell v. Thomas,* 784 F.Supp.2d 1270 (M.D. Al. 2011), *aff'd,* 641 F.3d 1255 (11th Cir. 2011).

the analysis is to consider whether, taking the facts as alleged in the light most favorable to the plaintiff, the defendant's conduct violated the plaintiff's constitutional right. *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The second step the district court must determine is whether the right allegedly violated was clearly established at the time of the infraction. *Id.* The sequencing of the analysis however has been left to the discretion of district court judges to determine which of the two prongs should be analyzed first. *Pearson v. Callahan,* 129 S.Ct. 808, 818 (2009). The relevant, dispositive inquiry in determining whether a constitutional right was clearly established is whether it would have been clear to a reasonable state official that his conduct was unlawful in the situation which he confronted. *Id.*

An official's conduct is protected by qualified immunity ***unless the very action in question has been held unlawful***. *Kinney v. Weaver,* 367 F.3d 337, 349-350 (5th Cir. 2004). An official does not lose qualified immunity merely because a certain right is clearly established in the abstract. *Id.* It is clearly established that the government may not deny due process or inflict cruel and unusual punishments, for example, but those abstract rules give officials little practical guidance as to the legality of particular conduct. *Id.* ***Qualified immunity should not be denied unless the law is clear in the more particularized sense that reasonable officials should be on notice that their conduct is unlawful***. *Id.* Defendants show that they did not violate any clearly established right of either Hoffman or Sepulvado at the time.

No Clearly Established Right Was Violated. As explained in detail earlier, the Fifth Circuit in this very case rejected the contention that death row inmates have a due process rights to Louisiana's execution protocol. Because Hoffman and Sepulvado have no such constitutional

right, Defendants cannot have said to violated their rights.  Defendants are entitled to qualified immunity as to this claim.

With respect to the access to the court claim, Hoffman and Sepulvado cannot point to how not allowing counsel in the "execution chamber" to confirm that the inmate is not being executed in a cruel and unusual manner limits their access to court in any manner.  What they are truly complaining about is not having their own witness to ensure that the execution is followed as detailed, not that the inmate's ability to assert a legal claim may be thwarted.  Because they are not truly asserting an access to courts claim, Defendants cannot be said to have violated a clearly established constitutional right to have counsel in the "execution chamber," as the stated purpose for counsel's presence is to act as a witness to the execution, not assert a claim.

While an inmate has a right to equal protection of the law, no facts were alleged that any of these Defendants deviated in any material way for Louisiana's written protocol.  Execution protocols where all inmates receive the same drugs and are subject to the same procedures fall short of establishing an equal protection claims.  *Ferguson, supra; Pardo, supra*.  Furthermore, it is insufficient for a plaintiff to rely upon prior execution in other states.  See, *Arthur,* 674 F.3d at 1262.  Because there are no allegations of prior deviations in Louisiana's execution protocol, there is no violation of a clearly established right.    Specifically, at no time has any court declared the very act engaged in by these Defendants unconstitutional.  As such, Defendants are entitled to qualified immunity.

Defendants are likewise entitled to qualified immunity as to the Eighth Amendment claims.  First, no court has ever required that execution protocols be promulgated or examined by

a medical professional.  In fact, just the opposite is true.  Courts across the country, including the U.S. Supreme Court in *Baze,* have repudiated the notion that an execution protocol is constitutionally deficient in the absence of the presence or participation of a physician. Secondly, conclusory allegations that the protocols are not adequately specific has been specifically rejected by the Fifth Circuit as a challenge to lethal injection execution.   See, *Thorson, supra.*  Because Hoffman and Sepulvado cannot even identify in what manner the protocols are inadequately specific, certainly Defendants have not violated a clearly established right.   Third, the Fifth Circuit as recently as last month in this very case acknowledged that a one-drug procedure complies with *Baze*.   One-drug combinations have been upheld by courts across the country, as acknowledged by *Sepulvado*.   The suggestion that pentobarbital will be ineffectively delivered in Louisiana is the opposite from being clearly established, inasmuch as the inmates in this case fail to point to a specific reason why pentobarbital under Louisiana's procedure would not be properly delivered.   Fourth, the notion that an execution protocol is constitutionally deficient in the absence of the presence or participation of a physician or other licensed medical personnel has been rejected again and again.   Defendants' actions are consistent with these many decisions and therefore cannot rise to the level of violating a clearly established right.   Fifth, the U.S. Supreme Court has ruled that it is reversible error for a trial court to assume based on nothing but conclusory allegations that a drug is unavailable or ineffective.   See, *Brewer, supra.*  Here, Sepulvado and Hoffman are armed with nothing more than the plaintiff in *Brewer* - the exact opposite of what a plaintiff must have in order to defeat a qualified immunity defense.   Because courts have rejected the exact claims made by the inmates in this case,

Defendants cannot be said as having acted in violation of a clearly established right.  Finally, no court has concluded that alleged inadequate testing of execution equipment violates an inmate's 8th Amendment rights. Therefore, Defendants are entitled to qualified immunity.

        <u>Defendants' Conduct Did Not Violate Any Constitutional Right</u>.  Even assuming that Hoffman and Sepulvado have alleged clearly established constitutional rights, which Defendants dispute as explained above, they still fail to identify any acts by these Defendants to violate such constitutional rights.  The only allegations concerning Secretary LeBlanc in the entire amended Complaint is that he "is responsible for overseeing Warden Cain in his drafting of the protocols." [Doc. 67, par. 90.]  The singular allegation concerning Warden Cain is that he "is responsible for ensuring that there is a constitutional protocol for executing Plaintiffs" and "for ensuing that executions are carried out in a constitutional fashion."  [Doc. 67, par. 88.]  Warden Norwood allegedly "is responsible for assisting Warden Cain in ensuring that there is a constitutional method for executing Plaintiffs."  [Doc. 67, par. 89.]

        The above are only legal conclusions that these Defendants have obligations to ensure that the constitutionality of executions is maintained.  There are no facts that these individuals defendants engaged in acts which purportedly violate Hoffman or Sepulvado's rights.

**3.    CONCLUSION**

        Defendants James LeBlanc, Angelia Norwood, and Burl Cain are entitled to have the amended complaint by Jessie Hoffman and Christopher Sepulvado dismissed as it fails to state a claim upon which relief can be granted.  Additionally, all claims against James LeBlanc, Angelia

Norwood, and Burl Cain in their individual capacities, should be dismissed on the basis of qualified immunity.

Respectfully Submitted:

/s Jacqueline B. Wilson
E. Wade Shows, La. Bar Roll No. 7637, wade@scwllp.com
James L. Hilburn, La. Bar Roll No. 20221, jamesh@scwllp.com
Jeffrey K. Cody, La. Bar Roll No. 28536, jeffreyc@scwllp.com
Jacqueline B. Wilson, La. Bar Roll No. 31055, jbw@scwllp.com
**SHOWS, CALI, & WALSH, L.L.P.**
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, Louisiana 70821
Telephone: (225) 346-1461
Facsimile:  (225) 346-1467

JAMES D. "BUDDY" CALDWELL
ATTORNEY GENERAL

David G. Sanders (La. Bar Roll No. 11696)
Douglas G. Swenson (La. Bar Roll No. 28773)
Assistant Attorneys General
**Louisiana Department of Justice**
Litigation Division
1885 North 3rd Street
P. O. Box 94005
Baton Rouge, Louisiana 70804-9005
(225) 326-6300 Telephone
(225) 326-6192 Facsimile

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing was electronically filed with the CM/ECF system and has served electronically to counsel for Jessie Hoffman and counsel for Christopher Sepulvado via the CM/ECF system, on this 9th day of September, 2013.

s/ Jacqueline B. Wilson
Jacqueline B. Wilson
