IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JESSIE HOFFMAN and | ) | |
| CHRISTOPHER SEPULVADO | ) | CIVIL ACTION |
| *Plaintiffs* | ) | |
| | ) | NO. 3:12-cv-00796 |
| v. | ) | |
| | ) | JUDGE JAMES BRADY |
| BOBBY JINDAL, Governor of Louisiana; | ) | |
| BURL CAIN, Warden, Louisiana State | ) | MAGISTRATE JUDGE |
| Penitentiary; JAMES LEBLANC, Secretary, | ) | ERIN WILDER-DOOMES |
| Louisiana Department of Public Safety and | ) | |
| Corrections; LOUISIANA DEPARTMENT OF | ) | |
| PUBLIC SAFETY AND CORRECTIONS; | ) | |
| ANGELA NORWOOD, Warden, Death Row; | ) | |
| and JOHN DOES, unknown executioners, | | |
| *Defendants* | | |

## INTERVENOR'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### NATURE OF THE CASE

This action is brought pursuant to 42 U.S.C. § 1983 for violations and threatened violations of Plaintiffs' rights under the First, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Louisiana's current execution protocol does not adequately protect Intervenor Shedran Williams from cruel and unusual punishment due to the insufficient training, expertise, and supervision of those involved in the administration of the lethal drug(s). Intervenor is also at a substantial risk of suffering a lingering or unnecessarily painful death due to the nature of the drug itself. Defendants have also engaged in a pattern of revising the execution protocol immediately before a scheduled execution date, which, coupled with Defendants' refusal to provide access to the protocols, denies Intervenor the due process right to evaluate and

1

challenge the method by which the Defendants seek to execute him and imposes essentially a separate execution protocol for each individual inmate, in violation of equal protection of the law. Mr. Williams additionally asserts that the execution protocol's secrecy provisions violate his rights to counsel and to access to the courts and access to government proceedings under the Fourteenth, Sixth and First Amendments. Mr. Williams seeks injunctive relief to prevent the Defendants from executing him through unconstitutional means.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

2.    Venue is proper in this District pursuant to 24 U.S.C. § 1391(b), as the events complained of have occurred/ will occur in this District.

## PARTIES

3.    Shedran Williams is a citizen of the United States of America, currently incarcerated under a sentence of death at the Louisiana State Penitentiary, in Angola, Louisiana ("Angola"), and is under the control and supervision of the Louisiana Department of Public Safety and Corrections. He has completed the administrative remedy process for this complaint.

4.    Defendant James LeBlanc is the chief executive officer of the Louisiana Department of Public Safety and Corrections ("DOC"). He was appointed to this position by former Governor Bobby Jindal. In this capacity, he has control of the DOC. By law, he is responsible for protecting the constitutional rights of all persons held in DOC's custody. At all relevant times, Leblanc was acting under color of law and as the agent, and, as a matter of law, the official representative of the DOC. Secretary Leblanc is sued in his individual and official capacities.

2

5.    Defendant Darrel Vannoy is the Warden of the Louisiana State Penitentiary in Angola. Under Louisiana law, Warden Vannoy is responsible for carrying out all Louisiana executions at Angola. In this capacity, he has operational control over Angola by making staffing, budget, and administrative decisions. By law, he is responsible for protecting the constitutional rights of all persons held in Angola's custody. At all relevant times, Warden Vannoy was acting under color of law and as the agent, and, as a matter of law, the official representative of Angola. Warden Vannoy is sued in his individual and official capacities.

6.    Defendant James Cruze is the Assistant Warden of Angola's Death Row. He has been in that position since 2015. In this capacity, Warden Cruze has operational control over Death Row by making staffing, budget, and administrative decisions. By law, he is responsible for protecting the constitutional rights of all persons held on Angola's Death Row. At all relevant times, Warden Cruze was acting under color of law and as the agent, and, as a matter of law, the official representative of Angola. Warden Cruze is sued in his individual and official capacities.

7.    Defendants John Does are involved in the implementation of the DOC's execution protocols including transport, administration of drugs, security, preparation for the execution, and a variety of other tasks. Plaintiffs have not been able, through due diligence, to discover their identities. Defendants LeBlanc, Vannoy, and Cruze possess information identifying these individuals as they are responsible for selecting the individuals to carry out these tasks. Plaintiffs anticipate that the identities of these unknown executioners will be revealed in discovery. John Does are sued in their individual and official capacities.

a.   Upon information and belief, Defendants John Does are citizens of the United States of America and residents of Louisiana.

## STATEMENT OF CLAIMS

8.   This action is brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, 18 U.S.C. § 3599, and 28 U.S.C. §§ 2201 and 2202 for violations and threatened violations by the Defendants of Mr. Williams's rights to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution, and for violations and threatened violations of Mr. Williams's rights to counsel, due process, access to the courts, and equal protection as guaranteed by the First, Sixth and Fourteenth Amendments to the United States Constitution.

9.   Mr. Williams challenges the constitutionality of his execution, whether performed pursuant to the latest protocol which would require the use of expired and/or illegally-obtained drugs which do not adequately protect Mr. Williams from cruel and unusual punishment, or performed pursuant to a newly amended protocol with insufficient time for review and evaluation.

10.   The Defendants are also in violation of the federal Controlled Substances Act 21 U.S.C. §§ 353(b), 829(a), 841(a)(1), and 843(a); 21 C.F.R. § 1306.04(a), by dispensing a Schedule II Controlled Dangerous Substance not in the course of professional practice and not for a legitimate medical purpose.

11.   The Defendants' current material deviations from their written execution protocol create a substantial risk of harm due to the lack of safeguards, and furthermore subject Mr.

4

Williams and other similarly situated condemned inmates to differential treatment, in violation of the Eighth and Fourteenth Amendments.

12.  The Defendants' past practices also suggest that the execution protocol will not be executed in a uniform and equal way, as they may substantially deviate from their execution protocols or promulgate a new protocol without sufficient time for review before his execution. As such, Mr. Williams asserts there is a substantial risk that his rights under the Eighth and Fourteenth Amendments will be violated.

13.   The Defendants' last-minute changes to execution protocols, as well as core deviations from the written protocol, also put Mr. Williams at a substantial risk of a violation of the *Ex Post Facto* Clause, Article I, § 10 of the Constitution, because the Defendants may change the method of execution to a manner that is more painful or protracted than the method in effect at the time he was originally sentenced. Defendants' deviations from any written protocol may have the effect of increasing the punishment due to the lack of safeguards and risk of maladministration.

14.  Mr. Williams seeks a declaratory judgment that the United States Constitution prohibits the Defendants from carrying out an execution without promulgating a protocol that has been found constitutional by this Court, and abiding to such protocol when an execution takes place. Additionally, Mr. Williams seeks a judgment ordering Defendants to notify him in a timely manner in the event that the execution protocol is revised.

15.  Mr. Williams alleges that the Defendants' lack of transparency regarding their execution protocol violates his First Amendment right of access to government proceedings and

prevents him from determining that the Defendants are capable for carrying out the death sentence in a lawful manner.

16. Mr. Williams alleges that the secrecy of the execution protocol also violates the Eighth Amendment's Cruel and Unusual Punishment Clause, as the clause derives its meaning from the evolving standards of decency that mark the progress of a maturing society. This standard requires that a court look to objective indicia that reflect the public attitude toward a given sanction; because the public is deprived of knowledge regarding Louisiana's executions, Plaintiffs' right to a punishment in line with contemporary values is violated.

17. Mr. Williams seeks a declaratory judgment that the Defendants cannot execute him without providing him access to counsel in the execution chamber from the time the strap-down team arrives until he is pronounced dead.

18. Mr. Williams seeks a permanent injunction to prevent the defendants from executing him through unconstitutional means.

19. This Complaint does not challenge Mr. Williams's underlying capital conviction or sentence of death. Rather, Mr. Williams challenges only the manner and means by which the DOC intends to execute him.

## FACTS

20. All statements of fact and allegations anywhere in this Complaint are incorporated by reference into the Complaint.

### Adoption of Lethal Injection as Method of Execution

6

21. In 1991, Louisiana adopted lethal injection as its method of execution pursuant to La. R.S. § 15:569.

22. Under La. R.S. § 15:568, the Secretary of the Department of Public Safety and Corrections is responsible for executing offenders in conformity with the death warrant issued in each case.

23. Louisiana defines lethal injection as "the intravenous injection of a substance or substances in a lethal quantity into the body of a person convicted until such person is dead." La. R.S. § 15:569.

24. No legislative guidance exists regarding lethal injection in Louisiana other than La. R.S. § 15:569.

25. The remaining details are left to the discretion of the DOC in developing and adopting an execution protocol.

**Nationwide Fluctuation of Execution Methods**

26. In the past six years, departments of correction around the country have depleted supplies of manufactured sodium thiopental and pentobarbital. As a result, some states have turned to methods of execution that have never been used before by any state, even in animal euthanasia.

27. Other states have turned to compounding pharmacies to create facsimiles of unavailable drugs. Compounded drugs are not subject to FDA approval and have recently resulted in a meningitis outbreak that claimed 64 victims in 2012. While compounding pharmacies are not subject to the same FDA regulation as manufacturers, they must be licensed by the

state's pharmacy board and comply with its regulations. Additionally, under the federal Drug Quality and Security Act, compounding pharmacies are prohibited from making and selling drugs that are "copies" of FDA-approved drugs.

28.   At the present time, however, states have used secrecy laws to impose impenetrable barriers to inmates seeking to ascertain factual information regarding the compounded drugs that the states seek to use in executions, including the source, quality, and efficacy of the drug. This puts inmates at a substantial risk of harm from improperly compounded, defective or contaminated drugs.

**Background Regarding the Louisiana Execution Protocol**

29.   The Department of Public Safety and Corrections instituted a three-drug protocol modeled off of Texas' protocol following the legislative amendment of La. R.S. § 15:569 in 1991. This protocol called for 2g of sodium thiopental, 40mg of pancuronium bromide, and 120meqs of potassium chloride.

30.   Upon information and belief, all seven inmates executed from 1993 to 2002 (Robert Sawyer, Thomas Lee Ward, Antonio James, John Brown, Dobie Gillis Williams, Feltus Taylor, and Leslie Dale Martin) were executed using the protocol of 2g of sodium thiopental, 40mg of pancuronium bromide, and 120meqs of potassium chloride.

31.   As of at least 2007, the protocol also called for 10 mg of Versed (midazolam).

32.   In 2008, the Department significantly increased the quantities of the lethal drugs called for in the protocol. The 2008 protocol called for 3 g of sodium thiopental, 50 mg of pancuronium bromide, and 240 meq of potassium chloride.

33. On January 7, 2010, the Department promulgated a new protocol, including the "Louisiana State Penitentiary Directive 09.049" and a checklist. On this same date, Gerald Bordelon was executed, using the new protocol.

34. In October of 2010, the Department admitted that it had no sodium thiopental in stock and that its pharmaceutical vendor had advised that the drug was unavailable.

35. On February 11, 2011, the Department revised the protocol to substitute 5 g pentobarbital for the sodium thiopental, apparently due to the unavailability of the latter. The new drug protocol called for 5g pentobarbital, 50mg of pancuronium bromide, and 240meq of potassium chloride.

36. On June 1, 2012, the Louisiana State Penitentiary Pharmacy's supply of pancuronium bromide expired.

37. Beginning in April of 2012, the Plaintiffs made repeated requests for a copy of the then-current protocol, through public records requests and administrative remedy procedures. The Department denied those requests.

38. Plaintiff Jessie Hoffman filed the instant lawsuit on December 20, 2012, asserting multiple constitutional violations including a violation of his due process rights to notice and an opportunity to be heard regarding the method by which he was to be executed.

39. Plaintiff Christopher Sepulvado, who was scheduled to be executed on February 13, 2013, filed to intervene and stay his execution on January 23, 2013.[1]

40. At a hearing on Mr. Sepulvado's motion to stay, this Court ordered the Defendants to explain how they planned to execute him. Counsel for the Defendants, for the first time, disclosed that the Department planned to use the drug pentobarbital. No other information regarding the protocol was provided at that time.

41. This Court granted the motion to stay on February 7, 2013.

42. Pursuant to its initial disclosure obligations, on June 17, 2013, the Defendants provided the Plaintiffs with a copy of a protocol dated January 10, 2013, which called for a single dose of 5 g of "pentobarbitol [sic]," followed by a saline flush.

43. The 2013 protocol differed significantly in several respects from the 2010 protocol, including material deletions and additions, and the substitution of a single dose of pentobarbital—an intermediate-acting barbiturate—for the three-drug formula consisting of an ultra-short-acting barbiturate, a paralytic, and concentrated potassium to stop the heart.

44. On September 1, 2013, the Louisiana State Penitentiary Pharmacy's supply of pentobarbital expired. Documents from that time reflected an availability date of "never."

45. However, on October 1, 2014, the Defendants provided a discovery response in this suit asserting that "there is an adequate supply of viable pentobarbital for use in executions by lethal injection as of this date."

---

[1] On January 8, 2014 Bobby Lee Hampton and Nathanial Code moved to intervene (Rec. Doc. 94 &95); on January 10, 2014 Kevan Brumfield moved to intervene (Rec. Doc. 101). The Court granted these motions to intervene on February 10, 2014 (Rec. Doc. 120).

46.   At that time, employees of the Defendants were actively seeking another source of lethal drugs. In a chain of emails dated September of 2013, a Deputy Warden corresponded with an agent for the Apothecary Shoppe, a compounding pharmacy in Oklahoma.

47.   The Apothecary Shoppe compounded drugs for at least three Missouri executions in 2013 and 2014. The federal Food and Drug Administration (FDA) and the Oklahoma Board of Pharmacy subsequently investigated the Apothecary Shoppe and found thousands of pharmaceutical violations, including questionable potency, disinfecting and sterilization practices. The pharmacy was also extending expiration dates on its drugs without proper testing or documentation. The pharmacy went into a receivership due to a litany of issues.

48.   In December of 2013, an execution warrant was signed for Mr. Sepulvado to be executed on February 5, 2014.

49.   The Louisiana Board of Pharmacy disclosed on December 19, 2013, that the Louisiana Department of Corrections did not have any expired stock of pentobarbital.

50.   On January 16, 2014, the Louisiana Board of Pharmacy additionally disclosed that the Louisiana State Prison Pharmacy "does not have any pentobarbital in stock nor has the pharmacy obtained any pentobarbital from any compounding pharmacy.  Additionally, [Pharmacist-in-Charge] Labatut stated that she has not been directed by anyone with the Department of Public Safety and Corrections to obtain any pentobarbital."

51.   During the time leading up to Mr. Sepulvado's scheduled execution, the Defendants were actively seeking out compounding pharmacies that would sell compounded pentobarbital. These efforts were apparently unsuccessful, and were not disclosed to the Plaintiffs until several months after the fact.

52.  Ultimately, the Defendants obtained entirely different drugs not named in the 2013 protocol. The Defendants purchased midazolam from Morris & Dickson on July 25, 2013.

53.  At 4:51 p.m. on January 27, 2014, 9 days before the scheduled execution, the Ohio Department of Corrections sent a fax to the (Louisiana) Department, attaching a copy of Ohio's lethal injection protocol. At that time, the protocol called for an array of lethal options to be chosen at the discretion of the warden, including a single dose of 5g pentobarbital, in manufactured or compounded form, "under whatever name it may be available," or a combination of 10mg midazolam and 40mg hydromorphone—under whatever names these drugs may be sold, compounded or manufactured, with additional back-up doses of 60mg hydromorphone. This protocol also allowed for the drugs to be injected either intravenously or intramuscularly.

54.  At 6:32 p.m. on January 27, 2014, the Department issued a new drug protocol. This protocol was almost identical to Ohio's, calling for an array of lethal options to be chosen at the discretion of the warden and/or pharmacist, including a single dose of 5g pentobarbital, in manufactured or compounded form, "under whatever name it may be available," or a combination of 10mg midazolam and 40mg hydromorphone—under whatever names these drugs may be sold, compounded or manufactured. This protocol also allowed for the drugs to be injected either intravenously or intramuscularly.

55.  On January 28, 2014, the Department purchased of 20 vials of 50mg/5ml (10mg/ml) of hydromorphone, from the Lake Charles Memorial Hospital. A member of the hospital's Board of directors later stated: "We assumed the drug was for one of their patients, so we

sent it. We did not realize what the focus was. Had we known of the real use, we never would have done it."

56. On February 1, 2014, 4 days before the scheduled execution, the Defendants disclosed that the Department had been unable to procure any pentobarbital, and would be using "Hydromorphone HC 150mg/5ml vial" and "Midazolam 2mg/2ml."

57. This disclosure did not comport with the invoices for the Department's purchase of hydromorphone. The invoice showed a purchase of 20 vials of 50mg/5ml (10mg/ml) of hydromorphone.

58. On February 3, 2014, the Defendants contacted the Plaintiffs of this suit and requested a 90-day TRO and stay of execution. This Court granted the TRO, which has since been extended and remains in effect.

59. Following the stay, the Department engaged in ongoing material revisions to its execution protocol. The Defendants disclosed numerous drafts in discovery. This Court ordered the Defendants to provide a final execution protocol by March 14, 2014.

60. On March 13, 2014, the Defendants sent via email a copy of the "revised lethal injection protocol."

61. This set of documents contained the following items:

    1. Department Regulation No. C-03-001, dated March 12, 2014 (7 pages);

    2. Form C-03-001-A, Agreement by Witness to Execution (1 page);

    3. "Attachment A" to Department Regulation No. C-03-001, March 12, 2014 (2 pages);

4.   "Attachment B" to Department Regulation No. C-03-001, March 12, 2014 (1 page);

5.   "Attachment C" to Department Regulation No. C-03-001, March 12, 2014 (2 pages);

6.   "Attachment D" to Department Regulation No. C-03-001, March 12, 2014 (1 page);

7.   "Attachment E" to Department Regulation No. C-03-001, March 12, 2014 (7 pages);

8.   "Attachment F" to Department Regulation No. C-03-001, March 12, 2014 (1 page); and

9.   Another copy of Form C-03-001-A, Agreement by Witness to Execution (1 page).

62.   In contrast, the set of documents disclosed on June 17, 2013, as the "Louisiana Execution Protocol" contained the following items:

1.   A list of the holders of the "Execution Manual";

2.   A telephone contact list;

3.   A chain of command;

4.   A list of institutional staff telephone numbers;

5.   Department Regulation No. C-03-001, dated August 1, 2012 (9 pages);

6.   A copy of La. R.S. § 15:567-571;

7.   Penitentiary Directive No. 09.049 dated January 9, 2013 (8 pages);

8.    Form C-03-001-A, Agreement by Witness to Execution;

9.   A checklist of "Internal Procedures for Execution," dated January 10, 2013 (8 pages);

10.   An "LSP Pharmacist Checklist" (1 page);

11.   A list of execution team duties (1 page);

14

12.   LCIW Policy No. 3-04-005, dated December 1, 2012 (5 pages);

13.   An undated checklist of "LCIW Internal Procedures for Execution" (1 page);

14.   A form letter from James LeBlanc to Burl Cain, advising that a death warrant has been set;

15.   A "Receipt of Warrant of Execution" form;

16.   A form letter from James LeBlanc to Bobby Jindal enclosing a death warrant;

17.   A form letter from James LeBlanc to "Clerk," enclosing redacted telephone numbers;

18.   A Clerk of Court Mailing List for Executions;

19.   A form letter from James LeBlanc to a victim's relative advising of an execution date;

20.   A form letter from James LeBlanc to a witness to the execution;

21.   An "Agreement by Witness to Execution" form;

22.   A "Request for Clergy Witness" form;

23.   A form regarding "Instructions for Disposition of Personal Property";

24.   A form regarding funeral arrangements; and

25.   A form letter from James LeBlanc to Bobby Jindal advising of phone numbers.

63.   Prior to the disclosure of the protocol in June of 2013, the 2010 execution protocol consisted of Penitentiary Directive No. 09-049 and a checklist. A 2008 version of the protocol also contained a checklist. Additionally, the January 27, 2014 revision to the execution protocol consisted of page 7 of the "checklist section of the *Protocol for Executions in Louisiana* manual" and a revised "LSP Pharmacist Checklist."

15

64.  Subsequently, the Defendants disclosed "documents that relate to the development of the current protocol." Included within these documents was a draft of Department Regulation No. C-03-001 labeled "DRAFT #2" which contained a checklist entitled "Internal Procedures or Execution" as was provided as part of the protocol in June of 2013. There was a handwritten note on the checklist, however, which read "Not Protocol."

65.  In an April 2014 deposition of Angela Whittaker, Confidential Assistant to Defendant LeBlanc, Ms. Whittaker stated under oath that she was still waiting for the Louisiana State Penitentiary to provide her with the directive. Until then, she keeps a "placeholder" where the directive should be in Secretary LeBlanc's execution protocol binder.

66.  Additionally, a committee of Department employees and attorneys met at least seven times in 2014 and 2015 to make recommendations regarding best practices for executions.

67.  On February 18, 2015, the Department released a "Report on Study and Methods of Execution & Recommendations for Procedures."

68.  The Report made two recommendations regarding the method of execution. First, the Report recommended a one-drug protocol of 5g of pentobarbital injected intravenously. Relatedly, the Report recommended that the Legislature pass strict secrecy legislation shielding the identities of any person who performs any ancillary function related to an execution.

69.  Second, the Report recommended that gassing be considered as a method of execution. Specifically, the Report recommended hypoxia induced by administering nitrogen gas through a gas mask or a "device similar to an oxygen tent house." The Report noted that research as to this method is "ongoing."

**The Louisiana Execution Protocol Poses a Substantial Risk of Serious Harm**

**A.     Risks Inherent to Pentobarbital Protocol**

70.   Pentobarbital is an intermediate-acting barbiturate. Sodium thiopental, in contrast, is an ultra-short acting barbiturate that takes effect within seconds. Pentobarbital is less lipid-soluble and crosses the blood-brain barrier much more slowly.

71.   Pentobarbital is not commonly used for general anesthesia purposes in humans because of its prolonged duration. Rather, in humans, pentobarbital is approved for use as a sedative-hypnotic or as an anticonvulsant.

72.   Pentobarbital is more likely than sodium thiopental to precipitate out of solution in the intravenous line or in the bloodstream, becoming unable to affect the brain, which enhances the likelihood that it will not achieve its intended effect as quickly as sodium thiopental.

73.   Upon information and belief, the Defendants, working outside of their pharmacy and the laws that govern pharmacies, have attempted to obtain compounded pentobarbital from an out-of-state pharmacy, in violation of state and federal law.

74.   Upon information and belief, medical doctors working for the Defendants will obtain and dispense compounded pentobarbital, a Schedule II Controlled Dangerous Substance, without a valid prescription and without a legitimate medical purpose.

75.   There is little scientific evidence on the effects of pentobarbital when injected into healthy and conscious humans in the amount and manner required by Louisiana's protocol.

76.   Compounded pentobarbital is not be subjected to the same level of quality control as pharmaceutical-grade pentobarbital. This may result in a preparation that does not have the correct chemical properties, and/or problems with contamination by extraneous chemicals

and/or microorganisms or microorganismal debris and toxins. Deviations such as those described above may result in a preparation that is painful when injected or is partially or completely ineffective.

77. Upon information and belief, the use of pentobarbital alone will likely result in a "lingering death" in violation of the Eighth Amendment.

78. Upon information and belief, the use of pentobarbital alone will likely cause serious harm to the condemned inmate. Even if properly administered, pentobarbital can result in an insufficient loss of consciousness and sensation, causing the condemned inmate to suffer excruciating pain and suffering while still conscious.

79. If the execution of Mr. Wessinger is allowed to proceed with the use of compounded pentobarbital, he will be subjected to cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

**B. Risks Inherent to Midazolam-Hydromorphone Protocol**

80. Midazolam is a benzodiazepine. It is a Schedule IV drug under the Controlled Substances Act.

81. Midazolam is not an anesthetic. It has no analgesic—or pain-relieving—effects. A person who is rendered unaware by midazolam and then subjected to a noxious stimulus such as pain or the sensation of suffocation, will return to awareness and experience that stimulus.

82. Midazolam is not approved by the FDA for use as, and is not in fact used as, a stand-alone drug to produce and maintain anesthesia in surgical proceedings.

18

83. Midazolam is subject to a ceiling effect, which means that there is a point at which increasing the dose of the drug does not result in any greater effect.

84. Use of midazolam carries a substantial risk of paradoxical reaction, which occurs when a drug does not work as intended. A paradoxical reaction to midazolam would cause an individual to remain aware as the execution proceeds.

85. There is a substantial risk of paradoxical reaction when midazolam is administered in high doses to individuals with a history of aggression or impulsivity, a history of alcohol abuse, or other psychiatric disorders.

86. Hydromorphone is an opioid drug, on Schedule II of the Controlled Substances Act. It causes ventilator depression, and is not generally administered to induce anesthesia.

87. Use of opioid drugs like hydromorphone may cause a paradoxical effect of hyperalgesia, or abnormal pain sensitivity. Another paradoxical effect of hydromorphone is anxiety.

88. A paradoxical reaction to hydromorphone would cause an individual to experience extreme pain and anxiety during an execution.

89. Louisiana is the only state in the country that currently has a two-drug protocol of 10 mg midazolam and 40 mg hydromorphone. Louisiana has never administered this protocol, however.

90. A two-drug midazolam-hydromorphone protocol has been used twice in United States history.

91. Both times it was used (100%) resulted in a horrific botch.

19

92.   First, on January 15, 2014, the State of Ohio executed Dennis McGuire using 10mg midazolam and 40mg hydromorphone. The execution began at 10:27 p.m. Approximately five minutes after the drugs were administered, Mr. McGuire began writhing in pain, pushing his head back and arching his back against the gurney. He was able to get his back and neck three to four inches off the gurney despite being strapped down. He made loud noises that sounded like he was fighting for air. This continued for over 20 minutes, before he gradually quieted. The time of death was 10:53 p.m.

93.   Less than two weeks after this shocking botch, the Louisiana Department of Corrections obtained a copy of the Ohio protocol used to execute Mr. McGuire and adopted it nearly wholesale as Louisiana's protocol to be used during Mr. Sepulvado's scheduled execution date of February 5, 2014.

94.   In the aftermath of the botched execution of Mr. McGuire, the Ohio Department of Corrections undertook an internal review, and Governor John Kasich issued reprieves to inmates set to be executed in the interim. As a result of the review, the Ohio Department of Corrections significantly increased the dosage of midazolam from 10 mg to 50 mg, and the dosage of hydromorphone from 40 mg to 50 mg.

95.   Emails later revealed that an attorney for the Ohio Department of Corrections had warned that the midazolam-hydromorphone protocol might result in a prisoner "gasping for air in a hyperventilating fashion, with eyes still open."

96.   On January 9, 2015, Ohio announced that it had abandoned the use of the midazolam-hydromorphone protocol. It instead adopted a protocol calling for 5 g pentobarbital, and if pentobarbital is not available, then a one-drug protocol of 5 g sodium thiopental would be

20

used. Currently, a moratorium on executions is in effect until at least 2017. Ohio has not

executed anyone since the McGuire botch.

97.    The second, and last, execution to be performed using a two-drug midazolam-

hydromorphone protocol was Joseph Wood in Arizona. The Arizona protocol called for 50

mg of midazolam and 50 mg of hydromorphone.

98.    The Arizona Department of Corrections began the execution of Joseph Wood at 1:52 p.m.

on July 23, 2014. At 1:57 p.m., Mr. Wood was sedated, but at 2:02 he began to breathe. At

2:03 his mouth moved. Mr. Wood began gasping and snorting, and continued for nearly

two hours. Witnesses counted more than 600 gasps. He was pronounced dead at 3:46 p.m.

99.    The execution log revealed that Mr. Wood was injected with the two-drug protocol 15

times, for a total of 750 mg each of midazolam and hydromorphone.

100.   An autopsy concluded that Mr. Wood's IV lines had been properly placed.

101.   Executions have been on hold in Arizona since the botch of Mr. Wood's execution.

102.   By specifying the use of a midazolam-hydromorphone protocol, Defendants have acted

with deliberate indifference to the risks inherent to the use of this drug combination.

103.   If the execution of Mr. Williams is allowed to proceed with the use of midazolam and

hydromorphone, he will be subjected to cruel and unusual punishment, in violation of the

Eighth and Fourteenth Amendments to the United States Constitution.

104.   The lethal injection protocol creates a demonstrated risk of severe pain.

**C.    Lack of Medical Oversight**

105.  On information and belief, the protocol has not been examined by a licensed medical professional to ensure that there are adequate safeguards to protect the condemned inmates' constitutional rights against torture, pain, and suffering.

106.  On information and belief, the protocol was promulgated without any medical research or review to determine that a prisoner would not suffer an unnecessarily painful or lingering death.

**D.    Core Deviations from Written Protocol**

107.  Upon information and belief, the Defendants have made core deviations from the written protocols in the past and may do so in the future.

108.  In the days following up to Christopher Sepulvado's scheduled February 5, 2014 execution date, the Defendants materially deviated from their written protocol.

109.  Upon information and belief, at 30 days prior to the execution, the Defendants did not perform the first five "actions" listed on the checklist dated "1-10-13," which were to (1) receive the warrant of execution from the secretary; (2) serve the offender with the execution order; (3) return the signed warrant to the secretary; (4) notify execution team and executive staff; (4) establish staffing for execution day; and (5) establish staff crisis support team for debriefing of officers post execution.

110.  Upon information and belief, the Defendants did not perform the first two items listed on its (undated) "LSP Pharmacist Checklist," an integral part of the protocol, specifically, to maintain at "all times . . . the following stock ensuring chemicals have not exceeded expiration date: 15 grams pentobarbital 50mg/ml solution;" and "30 days prior to execution

. . . [v]erify execution drugs are in stock as above and expiration dates will not be exceeded prior to execution date."

111. Upon information and belief, the Defendants will attempt to further deviate from their written protocol. These material deviations would violate Mr. Williams's constitutional rights under the Eighth and Fourteenth Amendments, as well as the Ex Post Facto Clause.

**E.   Lack of Oversight and Safeguards**

112. The protocol is not adequately specific, and is in a constant state of flux. As such, executions may be carried out in different manners each time, in violation of the Ex Post Facto and Equal Protection Clauses. There are no safeguards to protect against these variances.

113. On information and belief, the DOC will attempt to substitute drugs within their lethal injection process without creating procedures appropriate to the properties of the new drugs, such as how to flush the IV lines, the amount of the drug, or the timing of the administration of the drug.

114. On information and belief, the Defendants will seek to unlawfully use drugs that have been compounded, creating a substantial risk that the drugs are impure, contaminated, or otherwise defective.

115. On information and belief, Mr. Williams will suffer the wanton and unnecessary infliction of pain and torture, or a prolonged lingering death without careful review of the entire protocol if the DOC substitutes a different drug or compounded "copy" of pentobarbital for FDA-approved pentobarbital.

116.   On information and belief, the protocol will not be carried out in accordance with the written instructions, or will be administered in such a way that fails to adequately safeguard Mr. Williams's rights.

117.   The latest protocol promulgated by the Defendants does not include adequate safeguards to protect Mr. Williams from cruel and unusual punishment.

118.   On information and belief, Mr. Williams's execution will not be carried out in accordance with the written instructions, or will be administered in such a way that fails to adequately safeguard Mr. Williams's rights.

119.   There is a reasonable likelihood that lethal substances will be ineffectively delivered, and, as a result, it will not cause unconsciousness or adequate sedation for the duration of the execution process.

120.   On information and belief, the drugs identified in the protocol have expired and/or have been stored improperly by the Defendants Does in advance of the execution and thus will not have the effect that the protocol anticipates.

121.   On information and belief, the efficacy of the drug cannot be assured with any reasonable amount of certainty once it has been improperly stored or expired.

122.   The equipment used to carry out the execution includes medical equipment that must be inspected by a medical professional to ensure that it can be used effectively.

123.   On information and belief, the equipment used to carry out the execution has not been tested for efficacy or maintained by the Defendants since the last execution and thus will malfunction.

**F.   Lack of Training**

124.  On information and belief, Defendants Does are not medical professionals and have no medical training.

125.  On information and belief, in the past the Department has employed correctional officers to carry out the execution.

126.  The members of the execution team (John Does) will not have received adequate training and will make errors in carrying out the execution.

127.  Under the current protocol, Intervenor's execution will be carried out by Defendants John Does without adequate medical supervision.

128.  There is nothing in the current protocol that requires Defendants John Does to become familiar with the drugs they are administering in order to understand their properties, the dangers associated with those drugs, and/or any other relevant medical information.

129.  The protocol fails to standardize the timing for the administration of the drugs, and the execution team thus may err in their delivery.

130.  There is no provision for a medical history review by the Defendants under the protocol to ensure that the condemned inmate does not take any medications or have any medical conditions that might interfere with the efficacy of the lethal injection protocol.

131.  Those who will be selected to carry out the execution, Defendants John Does, lack the qualifications, training, and competence to do so in a constitutional manner.

132. The named Defendants know the Defendant John Does are unqualified to administer lethal drugs, but are deliberately indifferent to the risks that their failure to train and supervise the John Does will have on Mr. Williams's constitutional rights.

133. Upon information and belief, Defendants John Does will not engage in adequate practice sessions prior to Mr. Williams's execution.

134. In the past, Defendants John Does did not engage in adequate practice sessions, and violated the terms of the past protocols with regard to practice.

135. For example, under the 2013 protocol, once an execution date was set, the members of the Execution Team were required to train at least weekly. Plaintiff Sepulvado's execution date was set on February 5, 2014. According to the execution log provided in discovery, the execution team practiced exactly twice prior to Mr. Sepulvado's execution date. Significantly, the Defendants materially changed the protocol nine days before the February 5 execution date, which did not allow sufficient time to practice the new protocol.

136. Upon information and belief, the "execution practice" sessions held by Defendants are insufficient to adequately train Defendants to be able to undertake an execution in a constitutional manner.

137. The risk of maladministration of the lethal drugs due to lack of training is a substantial one.

138. The execution of Clayton Lockett on April 29, 2014, in Oklahoma, provides a telling example of the risk of maladministration of a midazolam protocol. Ten minutes after an intravenous (IV) line was set in Lockett's groin area and 100 milligrams of midazolam were administered, an attending physician declared Lockett unconscious. When the

paralytic and potassium chloride were administered, however, Lockett awoke. Lockett began to writhe against his restraints, saying, "[t]his s*** is f***ing with my mind," "something is wrong," and "[t]he drugs aren't working." Approximately 40 minutes after the execution began, Lockett was pronounced dead.

139. The lack of training of the execution personnel resulted in Lockett being stuck dozens of times with needles of varying lengths, in his arms, neck, and groin, and ultimately resulted in the ineffectiveness of the midazolam. The midazolam used in Mr. Lockett's execution wholly failed to render him unaware and insensate. As a result, Clayton Lockett died a slow, painful and lingering death.

140. Oklahoma stayed all future executions while it sought to determine what had gone wrong in Lockett's. Five months later, the State released an investigative report identifying a flaw in the IV line as the principal difficulty.

141. The lack of practice and training creates a substantial risk that Mr. Williams will suffer the wanton and unnecessary infliction of pain and torture, or a prolonged, lingering death, as he is put to death. This includes experiencing substantial pain and suffering, conscious paralysis, suffocation, or conscious cardiac arrest. On information and belief, any purported revised and current protocol does not include adequate safeguards to protect Mr. Williams from cruel and unusual punishment.

142. On information and belief, any purported revised protocol will not be administered in a way that adequately protects Mr. Williams from cruel and unusual punishment.

**G.    Lack of Attorney Access**

143.  Under the protocol, attorneys are allowed to remain with the condemned inmate only "until the strap down team arrives or until the visit is terminated at the discretion of the Warden." The condemned inmate is given no right to an attorney present throughout his execution.

144.  Without attorney access, there is no way to ensure that the execution protocol is carried out as directed.

145.  Without attorney access, there is no way to confirm that the condemned inmate did not suffer pain and suffering while conscious.

146.  Defendants' failure to provide inmates with meaningful access to counsel during the execution amounts to a denial of the right of access to the court system under the Sixth and Fourteenth Amendments.

**H.    Lack of Public Access**

147.  History shows that the evolving standards of decency in Louisiana have been shaped by public exposure to executions. The state switched from hanging to electrocution after a severely botched and gruesome public hanging in Jefferson Parish. Fifty years later, the state's move from electrocution to lethal injection was substantially affected by the publication of photos of the charred body of Robert Wayne Williams in the Angolite magazine, and reports of Jesse Tafero's head catching on fire during a Florida execution.

148.  Executions in Louisiana are not currently public. The protocol limits witnesses to between five and seven persons, including up to three members of the press selected by the Secretary, up to two victim family members, and other individuals selected by the Secretary.

28

149. Upon information and belief, even these limited witnesses are prevented from viewing the insertion of the lethal drug into the condemned inmate's vein.

150. The shroud of secrecy over lethal injections has deprived the public of assessing its contemporary approval of lethal injection and the death penalty in general.

151. Defendants' failure to provide public access to executions violates the First and Fourteenth Amendments, as well as Mr. Williams's right against cruel and unusual punishment as defined by contemporary standards of decency.

**I.    Ex Post Facto Punishment**

152. The Defendants' past practices in changing Louisiana's execution protocol make it substantially likely that Mr. Williams will suffer a different fate than is specified in the last-disclosed protocol, whether the state changes the type or source of the drug or makes other changes in its protocol.

153. There is also a substantial probability that the Defendants will make such changes without giving any notice to Plaintiffs.

154. The substitution of a compounded or different drug for an FDA-approved drug qualifies as a significant change increasing the severity of Plaintiffs' punishment, in violation of the Ex Post Facto Clause.

**J.    The Defendants are Responsible for Intervenor Williams's Harm**

155. Warden Vannoy is responsible for ensuring that there is a constitutional protocol for executing Mr. Williams. He is also responsible for ensuring that executions are carried out in a constitutional fashion.

156. Warden Cruze is responsible for assisting Warden Vannoy in ensuring that there is a constitutional method of executing Mr. Williams.

157. Secretary LeBlanc is responsible for overseeing Warden Vannoy in his drafting of the protocols.

158. Defendants John Does are responsible for carrying out the execution in a constitutional manner.

## CLAIMS FOR RELIEF

I.    Executing Mr. Williams without notice of the procedures to be used to deprive him of his life and a meaningful opportunity to be heard regarding those procedures violates his right to procedural due process under the Fourteenth Amendment.

    a.    Executing Mr. Williams without giving him fair notice of the lethal injection protocol and opportunity to be heard violates procedural due process. U.S. CONST. AMEND. XIV.

    b.    By amending the protocols on the day of Gerald Bordelon's execution (January 7, 2010), and nine days before Christopher Sepulvado's execution date (February 5, 2014), the Defendants have precluded timely and effective evaluation and judicial review.

    c.    The Defendants maintain that no inmate is entitled to notice of how he will be executed.

    d.    The Defendants are deliberately indifferent to Mr. Williams's rights.

II.   Executing Mr. Williams pursuant to the current Protocol would violate his rights under the Eighth and Fourteenth Amendments to be free from cruel and unusual punishment and to equal protection of law.

    a.   Among other violations, the Protocol fails to include adequate safeguards and/or will be administered in a way that fails to adequately protect Mr. Williams's constitutional rights to be free from cruel and unusual punishment.

    b.   Among other violations, in exempting the protocol from the Louisiana Administrative Procedures Act, the state has attempted to thwart well-established administrative rules, in violation of due process.

    c.   Among other violations, Defendants have, and will, materially deviate from any purported written execution protocol, impermissibly burdening Mr. Williams's right to be free from cruel and unusual punishment and violating his right to equal protection under the law.

    d.   Among other violations, Defendants may use compounded drugs to execute Mr. Williams, in violation of state and federal law, which poses a substantial risk of unnecessary pain and/or lingering death.

    e.   Among other violations, the drug combination used to execute Mr. Williams will cause a substantial risk of unnecessary pain and/or lingering death.

    f.   The Defendants are deliberately indifferent to Mr. Williams's rights.

III.  Executing Mr. Williams after substituting drugs used in any purported protocol without promulgating a new protocol would violate his rights to due process and to be free from

cruel and unusual punishment, and would violate the prohibition of ex post facto punishment.

    a.    The substitution of drugs without creating a new protocol to address the difference between the new drug and old drugs violates Mr. Williams's rights to due process, and will result in the infliction of cruel and unusual punishment.

    b.    The substitution of drugs in the existing protocol or by creating a new protocol creates a substantial risk that the new drug will increase the severity of the punishment, in violation of the Ex Post Facto Clause.

    c.    The Defendants are deliberately indifferent to Mr. Williams's rights.

IV.    The Protocol denies the condemned inmate access to counsel and the courts, in violation of the First, Sixth and Fourteenth Amendments.

    a.    The Protocol expressly excludes the condemned inmate's attorney from the execution chamber, preventing attorney access and observation during the execution, and preventing access to the courts.

    b.    The Defendants are deliberately indifferent to Mr. Williams's rights.

V.    The Protocol denies the public access to the execution, in violation of the First and Fourteenth Amendments, and Mr. Williams's right not to be subject to cruel and unusual punishment.

    a.    The Protocol expressly excludes the public from witnessing executions, in violation of the right to public access to government action and Mr. Williams's right to a punishment in accordance with evolving standards of decency.

     b.    The Defendants are deliberately indifferent to Mr. Williams's rights.

VI.     Request for Declaratory Judgment Pursuant to 28 U.S.C. § 1331.

     a.    A declaration that it is unconstitutional under the Eighth and Fourteenth Amendments for the Defendants to carry out an execution without first affording Mr. Williams notice and a meaningful opportunity to be heard regarding the execution protocol.

     b.    A declaration that it violates the Eighth and Fourteenth Amendments for the Defendants to carry out an execution using expired drugs, illegally-obtained drugs, drugs that were not properly stored in advance of the execution, or drugs obtained from a compounding pharmacy in violation of state and federal law.

     c.    A declaration that it violates Article I, § 10 of the Constitution for the Defendants to execute Mr. Williams using substituted drugs not specified in the current protocol.

     d.    A declaration that it violates Eighth and Fourteenth Amendments for the Defendants to execute Mr. Williams using the midazolam and hydromorphone protocol.

     e.    A declaration that it violates the Eighth and Fourteenth Amendments for the Defendants to carry out an execution without a detailed protocol in place.

     f.    A declaration that it violates the Eighth and Fourteenth Amendments for the Defendants to execute Mr. Williams pursuant to current Protocol.

g.   A declaration that it violates the Sixth and Fourteenth Amendments for the Defendants to prohibit Mr. Williams from having access to his attorneys during his execution.

h.   A declaration that it violates the First, Eighth, and Fourteenth Amendments for the Defendants to exclude the public from executions.

VII.   Request for a Permanent Injunction.

a.   A permanent injunction preventing the Defendants from executing Mr. Williams without affording notice of the protocol by which he will be executed at least six months in advance of any execution date.

b.   A permanent injunction preventing the Defendants from executing Mr. Williams without first promulgating an up-to-date protocol that comports with the protections guaranteed by the Eighth and Fourteenth Amendments and providing him adequate time to review and challenge it.

c.   A permanent injunction making all executions and the identities of the executioners public.

## DAMAGES

I.   As the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to Mr. Williams, Mr. Williams asserts claims under 42 U.S.C. § 1983, including, but not limited to, the following:

a.   Punitive damages;

b.     Presumed and nominal damages in the maximum amounts allowed by law; and

c.     Attorneys' fees and costs pursuant to 42 U.S.C. § 1988, or as allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Williams requests that this Court:

1.    Grant declaratory and permanent injunctive relief, as requested in this Complaint;

2.    Order the Defendants to provide timely notice to Mr. Williams every time the execution protocol is modified, regardless of whether an execution date has been set;

3.    Grant a permanent injunction enjoining Defendants from executing Mr. Williams without first promulgating an up-to-date protocol and providing him adequate time to review and challenge it;

4.    Grant a permanent injunction preventing the Defendants from executing Plaintiffs without affording access to the protocol by which he will be executed at least six months in advance of any execution date;

5.    Grant a permanent injunction enjoining the Defendants from carrying out an execution with expired drugs;

6.    Grant a permanent injunction enjoining the Defendants from carrying out an execution with compounded drugs;

7.    Grant a permanent injunction enjoining the Defendants from deviating from a valid written protocol;

8.    Grant a permanent injunction enjoining the Defendants from carrying out an execution without giving the condemned inmate access to counsel during the execution;

9.    Grant a permanent injunction enjoining the Defendants from carrying out an execution without giving the public access to the execution;

10.   Grant a permanent injection enjoining the Defendants from carrying out an execution pursuant to the current Protocol;

11.   Grant such further relief as it deems just and proper;

12.   Exercise continuing jurisdiction over the matter in order to ensure ongoing adherence to the Constitution; and

13.   Award Mr. Williams, as the prevailing party, attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988 and the laws of the United States, court costs, expert costs, litigation expenses, and any such relief as the Court deems just and proper.


                                         Respectfully submitted,

Date: June 28, 2016

                                         /s Mercedes Montagnes
                                         Cecelia Trenticosta Kappel (Bar No. 32736)
                                         Mercedes Montagnes (Bar No. 33287)
                                         The Promise of Justice Initiative
                                         636 Baronne Street
                                         New Orleans, LA 70113
                                         Tel. (504) 529-5955
                                         Fax (504) 558-0378

                                         s/ Letty S. Di Giulio
                                         Letty S. Di Giulio, La. Bar No. 29836
                                         Law Office of Letty S. Di Giulio
                                         1305 Dublin Street

                                         36

New Orleans, Louisiana 70118
Tel. (504) 864-1275
Fax (504) 864-1278

*Counsel for Shedran Williams*


## CERTIFICATE OF SERVICE


I hereby certify that a copy of the above and forgoing was filed electronically with the

Clerk of Court using CM/ECF on this day.  Notice of this filing as generated by the electronic

filing system constitutes service of the filed document on counsel for the Defendants.


/s Mercedes Montagnes
Mercedes Montagnes