## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JESSIE HOFFMAN, et al., | ) | |
| *Plaintiffs and intervenors*, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | NO. 3:12-796-SDD-EWD |
| BOBBY JINDAL, et al., | ) | |
| *Defendants*. | ) | |

## MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS

Plaintiffs, by and through undersigned counsel, submit this memorandum in opposition to Defendants' Third Motion to Dismiss. Rec. Doc. 263.

### I.        PROCEDURAL BACKGROUND

Plaintiffs are individuals under sentences of death at Louisiana State Penitentiary at Angola. They have brought or have intervened in this suit pursuant to 42 U.S.C. § 1983 for continuing and threatened violations of their rights under the First, Sixth, Eighth, and Fourteenth Amendments. This Court has ruled on Defendants' two earlier motions to dismiss. *See* Rec. Docs. 59, 99. As a result, the following claims remain pending before this Court: Plaintiffs' Eighth and Fourteenth Amendment claims to be free from cruel and unusual punishment and to equal protection of the law; ex post facto claims; First, Sixth and Fourteenth Amendments access to counsel and the court claims; and First and Fourteenth Amendments public access claims. *See* Rec. Doc. 59, at 14; Rec. Doc. 99, at 14.

On August 12, 2021, Defendants filed a Third Motion to Dismiss, in which they claimed for the first time in nine years that the Court lacks subject matter jurisdiction over Plaintiffs'

claims. Rec. Doc. 263-1, at 2-4. Defendants also argued, in the alternative, that *all* of the claims of the twelve most-recent intervening Plaintiffs should be dismissed for failure to state a claim, contrary to the law of the case. *Id.* at 4-25.

In support of this argument, Defendants submitted affidavits from Defendant Louisiana Department of Corrections ("DOC") Secretary James LeBlanc and DOC Chief of Operations Seth Smith, claiming that Defendants had not been able to procure drugs for lethal injection and would not be able to obtain them in the foreseeable future.[1] Those affidavits represented to the Court that Chief Smith "annually makes contacts by telephone … seeking to procure drugs for use in executions."[2]

Plaintiffs have now taken the depositions of Secretary LeBlanc, Chief Smith, and the head pharmacists of Angola and Elayn Hunt, Mary Labatut and Jonathan Travis. Plaintiffs also propounded some limited written discovery directed to the jurisdictional issues now before the court.

In response, Defendants produced approximately 17,500 pages. These documents called into question the veracity of the factual allegations in the original LeBlanc and Smith affidavits, regarding both the frequency of attempts to obtain execution drugs and the DOC's actual possession of execution drugs at this time.[3] Less than 48 hours before depositions were scheduled to begin, Defendants submitted new affidavits of Secretary LeBlanc and Chief Smith to "correct and/or clarify" additional facts that were revealed to Plaintiffs during discovery.

---

[1] *See* Ex. 1 (original affidavits of Secretary LeBlanc and Chief Smith).

[2] *Id.* at 6 ¶ 5.

[3] *See* Ex. 2 (LSP's inventory list including execution drugs such as diazepam, fentanyl, midazolam, and potassium chloride). The discovery did not include any communications from DOC employees reaching out to pharmaceutical companies to inquire about acquiring "execution" drugs.

Contrary to their prior, sworn statements, these new affidavits made clear that Defendants (i) have in their possession drugs that could be used for lethal injection and (ii) have not made any attempts whatsoever to procure the drugs from other sources since at least 2018.[4] The subsequent depositions of Secretary LeBlanc, Seth Smith, Jonathan Travis, and Mary Labatut established that while DOC has made a judgment that it will not use manufactured drugs in executions in order to ensure the ability to purchase drugs to treat patients within its prisons, upon being served with an execution warrant, the DOC would take whatever steps need to be taken in order to carry out its execution protocol.[5]

## II.    LEGAL STANDARDS

A motion to dismiss for failure to state a claim is "viewed with disfavor and is rarely granted." *Fraiche v. Sonitrol of Baton Rouge*, No. 08-392, 2009 U.S. Dist. LEXIS 138880, at *2 (M.D. La. Feb. 17, 2009) (quoting *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982)). The question under Rule 12(b)(6) "is whether in the light most favorable to the plaintiff and with every doubt resolved in [plaintiff's] behalf, the complaint states any valid claim for relief." *Nottingham v. Richardson*, 499 Fed. Appx. 368, 372-73 (5th Cir. 2012). "[T]o survive a motion to dismiss, [a plaintiff] need only allege enough facts to state a claim to relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A

---

[4] *See* Rec Doc. 302. Plaintiffs opposed the motion to substitute but had no objection to supplementation of the record, including updated affidavits. The Court granted the motion to substitute on December 16, 2021. Rec. Doc. 304.

[5] *See, e.g.*, Ex. 3, LeBlanc Depo. Tr. 23:19-23 (testifying that he would "shake the trees" to secure execution drugs); Ex. 4, Smith Depo. Tr. 20:1-23; 40:19-20; 42:23-24 (testifying that "a lot of drugs can kill you, if that's just the ultimate goal" and that "there is always a way to obtain something."). Only where relevant to Defendants' 12(b)(1) claims, Plaintiffs have cited to facts from written discovery, depositions, and matters outside the pleadings. *See Kling v. Hebert*, 2020 U.S. Dist. LEXIS 143800, at *11 (M.D. La. Aug. 11, 2020).

motion to dismiss under Rule 12(b)(1) is analyzed under the same standard as a motion to dismiss under Rule 12(b)(6). *Benton v. United States*, No. 91-1547, 1992 U.S. App. LEXIS 38464, at *3 (5th Cir. Feb. 12, 1992). The court must "assume the [plaintiffs'] view of the facts to be true for purposes of standing." *Texas v. Rettig*, 987 F.3d 518, 528 (5th Cir. 2021). A 12(b)(1) motion to dismiss for lack of standing can only succeed if the plaintiff has failed to make "general factual allegations of injury resulting from the defendant's conduct." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "A court should dismiss a case for lack of ripeness when the case is abstract or hypothetical." *Monk v. Huston*, 340 F.3d 279, 282 (5th Cir. 2003). Critically, Plaintiffs do not "have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *ECEE, Inc. v. Fed. Energy Regulatory Com.*, 611 F.2d 554, 557 n.7 (5th Cir. 1980) (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923)).

### III.    ARGUMENT

#### A.    Defendants' Motion is Premature

As an initial matter, this motion is premature. This Court has previously ruled on two motions to dismiss. Rec. Docs. 59 and 99.[6] After the second ruling, this case was stayed from

---

[6] In the Defendants' first motion to dismiss, filed on February 22, 2013, the Defendants argued, among other things, that the one-year statute of limitations began to run on the date of the challenged protocol. Rec. Doc. 40-1, at 4. The last-disclosed protocol at the time was dated January 7, 2010, the date Defendants executed Gerald Bordelon. Because the suit was filed on December 20, 2012, Defendants asserted that any claims were prescribed. *Id.* However, at the time the motion to dismiss was filed, unbeknownst to Plaintiffs, the Defendants had adopted a new protocol dated January 9 and 10, 2013, containing numerous changes including a switch to pentobarbital. This protocol was not disclosed until June 2013, after the Court ordered its disclosure and after Judge Brady denied Defendants' motion to dismiss. Rec. Docs. 62, 59. The Court denied Defendants' first motion to dismiss, finding that the claims were not prescribed because the Plaintiffs found out for the first time about the switch to pentobarbital when counsel for the Defendants was ordered to disclose the execution drug in open court on February 7,

May 2014 to June 2021.[7] The Court terminated the stay on June 30, 2021 and ordered that Plaintiffs' amended complaint be filed no later than January 7, 2022. Rec. Doc. 301. Once the amended complaint is filed, Defendants can then consider whether they wish to file a fourth motion to dismiss.

### B.    This Court has Subject Matter Jurisdiction

After review of the documents produced by Defendants, the affidavits submitted in support of the motion to dismiss, and the four depositions of DOC officials, Defendants' contention that they have no ability to obtain lethal injection drugs now or anytime "in the foreseeable future"[8] has been placed into context. First, it is clear that the DOC has made an unofficial **policy decision** not to stock a designated supply of "lethal injection drugs" in order to maintain a relationship with the drug manufacturers who object to the use of their products for executions. Second, it is also clear that when an execution warrant is signed, the DOC has broad discretion in determining the execution protocol, but **no discretion** to refuse to carry out the execution.[9] As Secretary LeBlanc testified in his deposition, "eventually [Plaintiffs] will be executed." *See* Ex. 3, LeBlanc Depo. Tr. 20:16-21:7. Indeed, Defendants testified that should a court issue execution warrant, they would be required to carry out the execution[10] and would do

---

2013. Rec. Doc. 59, at 9-10. The Court similarly denied Defendants' other claims for dismissal including failure to state a claim, and qualified and Eleventh Amendment immunity. *Id.* at 11-13.

[7] *See* Rec. Docs. 178, 184, 188, 197, 227.

[8] *See* Ex. 1 at 5 ¶ 18; 7 ¶ 8.

[9] Under Louisiana law, the court of original jurisdiction "shall" issue a warrant, which has the full force and effect of any other court order, commanding the Secretary of the Department of Corrections "to cause the execution of the person condemned as provided by law." La. R.S. § 15:567. An original execution date must be set between 60 and 90 days from the date the warrant is issued, and any subsequent dates after a stay or reprieve must be set between 30 and 45 days from the date the warrant is issued. *Id.* Plaintiffs could therefore be executed via lethal injection on 30-60 days' notice by issuance of a death warrant by a state court judge.

[10] *See* Ex. 3, LeBlanc Depo. Tr. 21:8-22:6.

whatever was in their power to effectuate an execution.[11] Dismissing this lawsuit would only facilitate last-minute, potentially dangerous, changes in the DOC's protocol under cover of darkness and without judicial oversight. This Court has jurisdiction to hear this challenge brought by condemned men subject to execution.[12]

Defendants claim to have made the unilateral choice not to use drugs – any drugs – in executions, which would make execution under the current statute impossible. However, when faced with a court order commanding him to execute a condemned individual, Secretary Leblanc would "begin the process of preparing [for execution]." *Id.* at 21:21-22. Part of that process would be to procure execution drugs. *Id*. at 22:7-8, 23:19-23. Furthermore, the DOC could access additional drugs and/or amend their protocols to reflect current inventory at any time.[13] The history of Defendants' actions in this case alone provides overwhelming evidence of the actions they can and will take as soon as they are ordered to do so.[14] This premature motion to dismiss is an attempt by Defendants to evade judicial review of their method of execution despite this Court's clear subject matter jurisdiction.

---

[11] *Id.* at 23:19-23; Ex. 4, Smith Depo. Tr. 20:1-5 ("We have drugs now we probably could use … [b]ut, I mean, a lot of drugs can kill you, if that's just the ultimate goal.").

[12] At a minimum, the impact of the DOC's policy decision in the context of its statutory duty is an issue requiring a factual determination.

[13] Indeed, seven states and the federal government executed twenty-eight people in 2020 and 2021 alone. *See Execution Database*, Death Penalty Info. Ctr., https://deathpenaltyinfo.org/executions/execution-database (last visited Dec. 29, 2021); *supra* fn 11.

[14] *See infra* fns 53-57; *see also West v. Brewer*, No. CV-11-01409-PHX-NVW, 2011 U.S. Dist. LEXIS 79213, at *7-8 (D. Ariz. July 20, 2011) (considering a correctional department's past execution practices in denying a motion to dismiss for failure to state a claim). It would be improper to assume that Defendants will behave any differently this time around, especially when all inferences must be drawn in the Plaintiffs' favor.

### 1.    Plaintiffs have Standing to Challenge their Method of Execution.

The Defendants broadly claim that Plaintiffs have no standing to challenge Louisiana's current method of execution because none are "presently threatened with any certainly impending injury." Rec. Doc. 263-1, at 4. Defendants have since admitted that they have drugs that can be used for lethal injection drugs in their possession and have not attempted to procure any "execution" drugs since at least 2018. Plaintiffs, who remain under sentences of death, clearly have met their burden of alleging injury stemming from Defendants' conduct: namely, the carrying out of their executions. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). It is the sentence of death that imbues this Court with jurisdiction, not the voluntary actions of Defendants.

Some of the drugs in stock in the DOC's pharmacies have been or may be used in executions. However, the DOC has designated its current inventory of drugs for patient treatment only.[15] Defendants have in their possession, at the very least, midazolam, alternatives to hydromorphone, potassium chloride, fentanyl, diazepam, and potassium acetate.[16] Whether or not the drugs that they currently have on hand are authorized by the current DOC protocol is irrelevant, as the protocol can change at any moment. Defendants have changed the policies and

---

[15] Ex. 4, Smith Depo. Tr. 19:14-20 ("And the pursuit of an execution does not outweigh the well-being and the health care that we have to provide for the other roughly 26-27,000 offenders. So there are drugs in stock that definitely could be used to execute somebody, but we cannot use them in that fashion.").

[16] *See* Ex. 2 (DOC's inventory list); Ex. 7 (emails regarding drug supply); Ex. 4, Smith Depo. Tr. 21:8-9 ("I'm sure we have midazolam in stock, I'm sure we do"); *id.* at 20:1-5 ("We have drugs now we probably could use … [b]ut, I mean, a lot of drugs can kill you, if that's just the ultimate goal."); Ex. 5, Travis Depo. Tr. 12:5-13:1; 14:11-15; 45:1-2; 45:17-18; 46:24-25 (testifying that he has obtained midazolam, alternatives to hydromorphone, potassium chloride, fentanyl, and diazepam); *id.* at 41:10-13 (testifying that he "probably would" transfer midazolam to Angola if requested by Mary Labatut, despite the certification with Pfizer); Ex. 6, Labatut Depo. Tr. 14:20-15:14 (testifying that she acquires midazolam and has midazolam in stock).

protocols multiple times before and during the pendency of this case, often just days before a scheduled execution date, and it is completely within their purview to do so going forward.[17] Second, Plaintiffs' challenges are not limited to just the three drugs that are currently authorized under the protocol,[18] which Defendants could have changed any time in the past eight years had they seen fit to do so. The recent discovery and deposition testimony is replete with evidence that they have researched, discussed, and considered other options throughout the years.[19] Defendants cannot divest Plaintiffs of standing and meaningful review of their constitutional challenges through technical designations of drugs.

As made abundantly clear through discovery, Secretary Leblanc has made the unilateral policy decision to cease taking steps to procure "execution" drugs until there is a pending execution date, and instead prioritize obtaining drugs to treat the inmate population. *See* Ex. 3, LeBlanc Depo. Tr. 22:7-23:18. The DOC has also chosen not to take steps to obtain a stock of "execution" drugs for at least three years now, following an agreement with a pharmaceutical manufacturer that it does not "administer capital punishment." Rec. Doc. 279-4 at 2, 4. Chief Smith had previously indicated that he or a member of his staff "made contact annually with

---

[17] *See, e.g.*, Ex. 3, LeBlanc Depo. Tr. 10:2-12:19; 13:21-15:3, 16:1-18; *id.*, Exs. 1 & 2 of LeBlanc Depo. Tr. (updates dated January 4 and 7, 2010 before the January 7, 2010 scheduled execution of Gerald Bordelon was carried out); *id.*, Ex. 3 of LeBlanc Depo. Tr. (update dated January 9, 2013 before the February 13, 2013 scheduled execution of Plaintiff Christopher Sepulvado); Ex. 8 (news article emailed to Secretary LeBlanc reporting on  Defendants announcing a new protocol nine days before Plaintiff Christopher Sepulvado's execution date).

[18] *See, e.g.*, Rec. Doc. 253, at 36-39 (Claims I, II.a-d., III, IV, and V).

[19] *See* Ex. 3, LeBlanc Depo. Tr. 31:6-25 (discussing considerations of adding nitrogen and the electric chair as alternative means of execution); Ex. 9 (DOC Report on Study of Methods of Execution & Recommendations for Procedures, article on the death penalty from Secretary LeBlanc's files with alternatives circled, and communications regarding alternative execution mechanisms); (Ex. 4, Smith Depo. Tr. 20:1-5 ("We have drugs now we probably could use … [b]ut, I mean, a lot of drugs can kill you, if that's just the ultimate goal.").

pharmaceutical manufacturers and suppliers seeking to procure drugs for use in executions,"[20] but at his deposition testified that he reached out to Pharmacists Mary Labatut and Jonathan Travis[21] – but nobody else – and has basically "given up any search of execution drugs at this time, and have for quite some time."[22] Even though ten other states and the federal government were able to access lethal injection drugs in order to carry out approximately fifty executions by lethal injection in the past three years, Defendants claim to have made almost no effort to contact those states as to their sources.[23] These policy choices are laudable, but they do not lift the sentences of death, nor do they change Louisiana law. As such, they do not deprive Plaintiffs of standing in this lawsuit. To be clear, regardless of Defendants' intentions, it clear that a sentence of death can still be carried out on as little as 30-60 days' notice.[24]

---

[20] Ex. 1 at 6 ¶ 5. Seth Smith also testified that he has had no training in drugs that may be used in executions despite his nursing background, Ex. 4, Smith Depo. Tr. 13:9-17, and that nobody has been tasked with maintaining a supply of lethal injection drugs since 2014 "because it's been unobtainable." *Id.* at 14:17-24.

[21] Neither of the pharmacy directors knew who was responsible for procuring drugs for lethal injection, and Mr. Travis testified that he had not even spoken to Chief Smith in "a long time." Ex. 5, Travis Depo. Tr. 11:14-23; *id.* at 53:19-20; Ex. 6, Labatut Depo. Tr. 10:16-21 ("I am totally out of the lethal injection business."); *id.* at 22:12-15.

[22] Ex. 4, Smith Depo. Tr. 14:25-15:23 (Chief Smith testifying that he reached out to the pharmacies at Elayn Hunt and Angola "on more than one occasion to discuss the availability" but hasn't reached out to anyone else "in quite some time."); *id.* at 20:6-23; 30:15-17 (testifying that he would not contact the pharmaceutical companies directly); *id.* at 22:13-15 ("Basically, I've given up any search of execution drugs at this time, and have for quite some time."); *id.* at 30:5 ("[A]nnual may be an overstatement.").

[23] Ex. 4, Smith Depo. Tr. 41:7-11 (Q: Have you had any contacts with anybody from other state departments of corrections? A. Zero.), *id.* at 43:18-24; *id.* at 41:19-42:10 (testifying that he had a "30,000-feet conversation" about how Mississippi obtained execution drugs); Ex. 6, Labatut Depo. Tr. 26:8-22; Ex. 3 LeBlanc Depo Transcript 41:2-42:20; 44:13-45:4 (testimony that Secretary LeBlanc keeps a folder on anything to do with death penalty executions, including newspaper articles, magazine articles, Angolite articles, etc.); Ex. 4, Smith Depo. Tr. at 17:17-19 (testifying that he had done research on different drugs that could be used for lethal injection); *see also* Emily Wagster Pettus, *Analysis: Mississippi Reveals it has Lethal Injection Drugs*, AP News (Aug. 9, 2021), https://apnews.com/article/mississippi-2696d6627189418cda0d96a4e5cfecef.

[24] *See supra* fn 9.

Louisiana law requires Secretary LeBlanc to carry out executions upon issuance of a warrant.[25] It is his duty to find drugs to carry out the execution as ordered. Defendants have demonstrated they will make last-minute herculean efforts[26] to access pentobarbital and/or hydromorphone (or, as explained below, simply change the protocol) in the event that a death warrant is issued.[27] Chief Smith testified that he would reach out to the pharmacists at Elayn Hunt and Angola and ask them if they could obtain the drugs[28] and would go and get drugs from a hospital.[29] He testified that "a lot of drugs can kill you, if that's just the ultimate goal" and that "**there's always a way to obtain something.**"[30]

Defendants' claim that their hands are tied by a certification with a single drug manufacturer, to which they are not a party, is a red herring. In the context of these certifications, Defendants have characterized drugs, including drugs that they *currently have in their possession*, before this Court as "unavailable" for lethal injection. *See* Ex. 1 at 5 ¶ 18; 7 ¶ 8. The certifications are signed by non-parties[31] (DOC's medical staff) and purport to certify that the DOC does not carry out capital punishment.[32] Even assuming these certifications are valid,[33]

---

[25] *See id.*

[26] *See infra* fns 53-57; Ex. 3, LeBlanc Depo. Tr. 23:19-23 (Q: But would you maybe, you know, try and shake the branches a bit…A: I, you know, yeah, I mean, that's part of what we need to do and should do and – and we do that, you know.).

[27] *See West*, 2011 U.S. Dist. LEXIS 79213, at *7-8 (considering a correctional department's past execution practices in denying a motion to dismiss).

[28] Ex. 4, Smith Depo. Tr. 20:6-12.

[29] *Id.* at 40:19-20.

[30] *Id.* at 20:3-5; 42:23-24.

[31] Ex. 3, LeBlanc Depo. Tr. 38:9-13 (Q: Have you ever signed anything attesting that you wouldn't use drugs in executions personally? A: No, I don't think I've ever signed anything."); *id.* at 53:1-5 (Q: [A]re you aware of any other DOC staff having executed some sort of certification not to use drugs for lethal injection? A: Not that I'm aware of.); *id.* at 56:15-17.

[32] Ex. 10 (Email between Dr. John Prejean and Jonathan Travis regarding Louisiana still engaging in capital punishment despite the Pfizer disclaimer); Ex. 5, Travis Depo. Tr. 35:21-37:5 (testifying that that part of the certification is false).

they contain no clear enforcement mechanisms or length of term. And, even if the certifications were enforceable against the signatories, there is no provision that makes them enforceable against third parties like Defendants.

At most, the certifications would have impacts after an execution; they do not preclude one. There is simply no requirement that the DOC not use the drugs it has on hand for lethal injections.[34] In fact, DOC Pharmacist Mary Labatut received and forwarded emails in May of 2021 from an out-of-state pharmacist regarding how other correctional agencies have successfully breached similar contracts.[35] This is clearly an available option if a state judge issues a death warrant and Defendants are at risk of contempt or subject to political backlash for failing to comply.

The DOC's decision not to purchase and maintain a designated supply of "execution" drugs does not make any of Plaintiffs any less at risk of execution in violation of the Eighth and Fourteenth Amendments. In fact, to dismiss this lawsuit at this stage, without a thorough review of the methods by which Plaintiffs will be executed, only makes it more likely that their

---

[33] In fact, the certification that Defendants have previously relied on, Rec. Doc. 279-4, was actually rejected by Pfizer. *See* Ex. 11, at 1 ("We had Dr. Morrison sign this form but Pfizer rejected."). Defendants also did not produce a certification signed by the current DOC medical director, Dr. Randy Lavespere, in his current capacity, or Angola's Pharmacist, Mary Labatut. Ex. 6, Labatut Depo. Tr. 21:15-25. After the depositions, Defendants produced for the first time a document dated August 3, 2018, from Mary Labatut and Dr. Lavespere to Morris and Dickson indicating that they had signed a certification agreement with Pfizer. Ex. 12. This document was not produced in discovery.

[34] *See, e.g.*, *Fresenius Kabi USA, LLC v. Nebraska*, No. 4:18CV3109, 2018 U.S. Dist. LEXIS 135258, at *5 (D. Neb. Aug. 10, 2018) (denying drug company's request for a temporary restraining order prohibiting the state from using their drugs in an execution), *interlocutory appeal denied*, 733 Fed. Appx. 871 (8th Cir. 2018).

[35] *See* Ex. 13 (May 17, 2021 emails).

inevitable executions will violate their constitutional rights. Executions carried out in other states make it clear that such a constitutional violation is likely to occur in the event of an execution.[36]

Even if Defendants cannot at this moment in time carry out an execution without jeopardizing their access to drugs needed for medical care, they are playing a dangerous game by asking that this lawsuit be dismissed by the Court. This is evident from the fact that Defendants also refuse to re-enter into a stay that would maintain the status quo and provide protection if and when a death warrant is issued.[37] Secretary LeBlanc has stated under oath that he is required by Louisiana law to carry out executions pursuant to death warrants,[38] does not have any control over setting the execution dates,[39] believes that the people living on death row will "eventually be executed,"[40] and that carrying out executions is the most serious part of his job.[41] Plaintiffs do

---

[36] One of the most recent executions by lethal injection is instructive. On October 25, 2021, the district court denied John Grant's motion for preliminary injunction to litigate the constitutionality of Oklahoma's protocol. *See* Order on Second Motion for Preliminary Injunction, *Glossip v. Chandler*, No. Civ-14-0665-F, Doc. 532 (W.D. Okla. Oct. 25, 2021). Three days later Grant was executed by lethal injection where he "convulsed repeatedly and vomited" after he was administered midazolam. Khaleda Rahman, *Another 'Botched' Execution in Oklahoma Fuels Outrage*, Newsweek (Nov. 3, 2021), https://www.newsweek.com/another-botched-execution-oklahoma-fuels-outrage-1645429. Associated Press media witness Sean Murphy said that "Grant's body shook and jerked nearly two dozen times before vomit spurted from his mouth and spilled down his neck." Jaclyn Peiser & Christine Armario, *Oklahoma Death Row Inmate Convulsed, Vomited During Lethal Injection, Witness Says, as State Resumes Executions*, Wash. Post, (Oct. 29, 2021), https://www.washingtonpost.com/nation/2021/10/29/john-marion-grant-oklahoma-execution/.

[37] Ex. 3, LeBlanc Depo. Tr. 35:21-36:5 (in response to questioning as to why the DOC would not agree to a stay of executions: "[I] think we're trying to move forward with it, whatever we can do, you know. That's about the size of it for me."); Ex. 4, Smith Depo. Tr. 20:16-19 ("I would say it to my boss, Secretary LeBlanc, and then he would have to say it to whoever he has to, I guess ultimately the court, whoever the death warrant comes from."). As discussed further below, Defendants are creating a catch-22 situation as federal courts have repeatedly blocked any attempts to rush into court at the "eleventh hour" and request a stay once executions are scheduled. *See infra* fn 61.

[38] Rec. Doc. 263-2 ¶ 3; *See also* Ex. 3, LeBlanc Depo. Tr. 21:8-12 (Q: "And so you are in charge of the administration of capital punishment in the State of Louisiana?" A: "Yeah, I guess that's a good way to put it.").

[39] Ex. 3, LeBlanc Depo. Tr. 18:22-19:24.

[40] *Id.* at 20:16-21:7; 31:6-25 (discussing considerations of adding nitrogen and the electric chair as alternative means of execution).

not doubt that Secretary LeBlanc has currently prioritized ensuring access to pharmaceuticals to treat the prison population, rather than procuring the drugs needed for lethal injection or using the ones the DOC has on hand.[42] However, he, or his successor, [43] could change that decision on a moment's notice, particularly if he is ordered to carry out an execution by a death warrant.[44]

The situation is further complicated by the fact that there is clearly immense pressure on the DOC from the Attorney General and others to do whatever is necessary to facilitate executions, even in the absence of a pending death warrant.[45] Defendants disclosed in discovery a 2017 meeting called by people "from the other side"[46] with Secretary LeBlanc, DOC's General Counsel, DOC's Chief of Operations, assistant district attorneys, and others "want[ing] to get something going in the right direction with regard to carrying out executions."[47] During this meeting, the Attorney General's office indicated that they were going to get the pharmacy board to change some of their regulations. Secretary LeBlanc testified that they proposed a lot of different methods – including fentanyl – to the execution protocol and that it was a "crazy, strange" meeting.[48] Chief Smith testified that they made "some very ridiculous suggestion as to

---

[41] *Id.* at 35:18-20.
[42] *See* Ex. 3, LeBlanc Depo Tr. 22:7-23:1; 23:23-24:1 ("I'm not in a position to – to jeopardize our prison population with – with doing things underhandedly. I'm – I'm not going there.") *See also* Ex. 4, Smith Depo. Tr. 19:14-20 ("And the pursuit of an execution does not outweigh the well-being and the health care that we have to provide for the other roughly 26-27,000 offenders. So there are drugs in stock that definitely could be used to execute somebody, but we cannot use them in that fashion."); *id.* at 40:19-41:6.
[43] *See* Ex. 4, Smith Depo. Tr. 53:12-54:12.
[44] *See* Ex. 3, LeBlanc Depo. Tr. 23:19-23; *see also* Ex. 4, Smith Depo. Tr. 20:1-5 ("We have drugs now we probably could use … [b]ut, I mean, a lot of drugs can kill you, if that's just the ultimate goal.").
[45] *See* Ex. 3, LeBlanc Depo. Tr. 24:19-25:7.
[46] Ex. 9, at 15; Ex. 4, Smith Depo. Tr. 45:25; 46:15-25.
[47] Ex. 3, LeBlanc Depo. Tr. 25:23-32:2.
[48] *Id.* at 28:12-30:12.

13

how we go about executing people … like street drugs … they maybe even mentioned bleach."[49] Secretary LeBlanc stated that he believes the Attorney General is "sincere about carrying out executions" and that the "way he went about doing it brought in the political side."[50]

In 2018, there was a public exchange of letters between Attorney General Jeff Landry and Governor John Bel Edwards putting public pressure on the DOC to pursue executions, including expanding the current drug options (specifically to single-dose midazolam) and compounding drugs at Angola.[51] At the time, there was no active execution warrant and no urgent need to identify an available execution drug cocktail. However, Secretary LeBlanc himself stated at his most recent deposition that "where we are right now is not helping anybody, you know, and so something needs to change," and indicated that they were "trying to move forward with it."[52]

Recent history also shows that Defendants have been willing to undertake any and all efforts, including those potentially prohibited by law, once an execution date is set. For example, pending Plaintiff Christopher Sepulvado's scheduled execution in 2013, Defendants initiated steps to order pentobarbital from a compounding pharmacy in Oklahoma despite the fact that that

---

[49] Ex. 4, Smith Depo. Tr. 46:3-14.

[50] Ex. 3, LeBlanc Depo. Tr. 34:9-13. *See also id.* at 39:23-41:1 and Ex. 6 of LeBlanc Depo. Tr. (referencing the Attorney General's involvement in opioid lawsuits).

[51] *See* Ex. 14 (recent communications between the Attorney General, Governor's Office, and Department of Corrections); Ex. 4, Smith Depo. Tr. 20:1-5 ("We have drugs now we probably could use … [b]ut, I mean, a lot of drugs can kill you, if that's just the ultimate goal."); *id.* at 32:9-23 ("I assure you that [Attorney General's press release] did not make a light bulb go off on how we could obtain execution drugs."); *see also* Julia O'Donoghue, *Louisiana Executions Won't Resume Anytime Soon, but It's Not Clear Anyone Will Do Something It*, The Advocate (Mar. 13, 2019), https://www.theadvocate.com/baton_rouge/news/politics/article_82e19a30-32cf-5529-b085-cc07cf7d683d.html (quoting Attorney General Landry: "[t]hey could spell out that they could use fentanyl [for executions]. We got plenty of that in our evidence lockers," and explaining that he suggested "fentanyl from the street seized by police could be used to execute people on death row.").

[52] Ex. 3, LeBlanc Depo. Tr. 37:11-13; *id.* at 35:21-36:4.

pharmacy was not licensed in Louisiana.[53] Defendants have also claimed that they cannot obtain execution drugs through a compounding pharmacy as they are unable to guarantee that the pharmacies' identity will not be disclosed,[54] but they have previously argued that La. Rev. Stat. §15:570(G) should be interpreted to extend to manufacturers and suppliers, including pharmacists, and attempted to enter into confidentiality agreements under that authority.[55]

In fact, under very similar circumstances in 2014 where Defendants claimed not to have access to pentobarbital or hydromorphone, they were actually able to purchase hydromorphone from Lake Charles Memorial Hospital a week before Plaintiff Sepulvado's next scheduled execution.[56] Defendants procured twenty vials of the drug[57] from Lake Charles Memorial Hospital without revealing that it was going to be used for an execution rather than routine medical treatment.[58] Nothing but Defendants' own strategy of inaction prevents them from taking similar steps today.[59] Dismissing the claims for a lack of standing would prevent the

---

[53] Ex. 15 (Letter from Attorney Kathy Kelly to DOC; Email communication between Chief Smith and the Oklahoma pharmacy regarding an NDA); Ex. 8 (news article emailed to Secretary LeBlanc reporting on Defendants' procurement of drugs for Plaintiff Christopher Sepulvado's execution date); Ex. 4, Smith Depo. Tr. 35:1-11.

[54] Ex. 16, at 4 (Defendants' response to Plaintiffs' Fourth Set of Interrogatory Responses).

[55] *See* Rec. Doc. 79, at 9-14; *see also* Rec. Doc. 124, at 2-3; Ex. 3, LeBlanc Depo. Tr. 53:8-18 (regarding legislative efforts to try to maintain secrecy regarding the source of lethal injection drugs).

[56] Ex. 4, Smith Depo. Tr. 24:16-26:9 (describing procuring hydromorphone from Lake Charles Memorial Hospital); Ex. 8 news article emailed to Secretary LeBlanc reporting on Defendants' procurement of drugs for Plaintiff Christopher Sepulvado's execution date).

[57] Based on Defendants' discovery responses, the drugs they procured from Lake Charles Memorial Hospital were not the correct concentrations per the protocol in place at the time. *See* Rec. Doc. 127, at 5.

[58] The parties entered into a stay shortly thereafter. Rec. Doc. 178.

[59] In fact, Defendants were almost put in this precarious position recently when Plaintiff Jason Reeves was scheduled to be executed on August 19, 2019, but a federal judge stayed the execution pending review of his federal habeas petition less than a month before his scheduled execution. *Reeves v. Vannoy*, No. 2:19-cv-00925, Rec. Doc. 8 (W.D. La. July 26, 2019). Furthermore, Defendants' refusal to supply Plaintiffs with information on how they will be executed is itself an injury inflicted on the Plaintiffs – they are unable to assess the State's plans for an execution, contest those plans, and raise their claims in Court. *See McGehee v. Hutchinson*, 463 F. Supp. 3d 870, 925 (E.D. Ark. 2020) (finding standing because

Court from engaging in the meaningful review that is warranted in a case of this magnitude where Plaintiffs' lives hang in the balance.

## 2. Plaintiffs' Claims are Ripe for Review

Defendants also argue that Plaintiffs' claims are unripe and speculative, based on the same purported lack of access to lethal injection drugs as discussed above.[60] If Defendants' interpretation of ripeness were correct, Plaintiffs would never be able to obtain meaningful review of their claims – it would always be too early or too late. *See Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004). The Fifth Circuit has made clear that complex life-and-death matters should not be considered at the last minute. *See Whitaker v. Livingston*, 597 F. App'x 771, 774 (5th Cir. 2015) (reversing the district court's dismissal on ripeness grounds); *see also Harris v. Johnson*, 376 F.3d 414, 417 (5th Cir. 2004). That would be the most optimistic result of granting Defendants' Third Motion to Dismiss – it is more likely that they would not be considered at all. Courts have repeatedly blocked any attempts to rush into court at the "eleventh hour" and request a stay once executions are scheduled.[61] To the extent that this Court is concerned about potential needless expenditure of time and resources, the Court could instead enter an order requiring the

---

an access-to-court claim alleged an injury based on the plaintiffs' inability to seek redress for a prospective execution-related constitutional violation).

[60] All argument is incorporated therein.

[61] *See e.g.*, *Kincy v. Livingston*, 173 Fed. App'x. 341, 342 (5th Cir. 2006) (affirming district court's dismissal of Kincy's complaint due to his delay in filing the suit after he was scheduled to be executed); *White v. Johnson*, 429 F.3d 572, 574 (5th Cir. 2005) (affirming dismissal of action when White waited until his execution was imminent to challenge procedure); *Harris*, 376 F.3d at 417-419 (vacating the temporary restraining order granted by the district court and dismissing Harris' suit finding that waiting until the execution date was set was too late to file a § 1983 suit); *Grayson v. Dunn*, 156 F. Supp. 3d 1340, 1342 (M.D. Ala. 2015) (denying stay based on "[h]is emergency motion to stay his execution comes too late in the litigation day"); *Bible v. Davis*, 2018 U.S. Dist. LEXIS 103829, at *10-12 (S.D. Tex. June 21, 2018) ("Any urgency is a matter of Bible's own creation … Bible's delay in bringing this suit - without which the Court and the Defendants could have considered and litigated the matter without the rush and pressure of a pending execution date - must be fairly held against Bible."); *see also Whitaker*, 597 Fed. Appx. at 773 ("This court has repeatedly and consistently maintained that inmates such as Whitaker are not entitled to equitable, eleventh-hour injunctive relief based on claims under § 1983.").

Defendants to file a notice once it obtains additional drugs or modifies the protocol, and stay the case pending notice or issuance of a death warrant.

Plaintiffs' claims are ripe because the DOC has, or could easily obtain, the drugs in its current protocol, and that protocol has not been rescinded.[62] Moreover, the Plaintiffs' challenges are not limited to the DOC's current protocol, which has changed several times – and often last-minute – during the pendency of this case.[63] As a matter of law, the Court cannot find that any allegedly forthcoming or potential changes in protocol render a case unripe when the Defendants have been known to change the protocol on the day of an execution.[64] *See Whitaker*, 597 F. App'x at 774 (finding that the district court erred in dismissing a case as unripe on the basis that Plaintiffs did not yet know the means of their execution).

If Plaintiffs' claims were dismissed as moot and they were not able to file a new action until a new protocol is officially adopted, that would not allow sufficient time to review and investigate that protocol, which Courts have found takes at least 90 days.[65] If embraced by the Court, Defendants' approach to ripeness means that Plaintiffs will be completely unable to meaningfully contest any aspect of their executions. There is no speculation here: without a stay, Plaintiffs could be scheduled for execution in as few as 60 days.[66] Neither Plaintiffs nor

---

[62] *See supra* fn 16; Ex. 17 (emails from pharmaceutical companies); Ex. 4, Smith Depo. Tr. 20:3-5; 42:23-24.

[63] *See supra* fn 17-18; Ex. 4, Smith Depo. Tr. 16:15-21.

[64] Ex. 4, Smith Deposition Testimony 18:10-25 (testifying that the DOC could change the protocol in a day or as little as four hours); *id* at 26:24-27:1; Ex. 3, LeBlanc Depo. Tr. 10:2-12:19; 13:21-15:3, 16:1-18; *id.*, Exs. 1 & 2 of LeBlanc Deposition (updates dated January 4 and 7, 2010 before the January 7, 2010 scheduled execution of Gerald Bordelon was carried out); *id.*, Ex. 3 of LeBlanc Deposition (update dated January 9, 2013 before the February 13, 2013 scheduled execution of Plaintiff Christopher Sepulvado); Ex. 8 (news article emailed to Secretary LeBlanc reporting on  Defendants announcing a new protocol nine days before Plaintiff Christopher Sepulvado's execution date).

[65] *See, e.g.*, *Floyd v. Daniels*, 3:21-cv-00176-RFB-CLB, Rec. Doc. 128 at *7-8 (July 6, 2021).

[66] *See* LA Rev Stat § 15:567.

Defendants can anticipate when a death warrant will be issued.[67] Indeed, the Fifth Circuit has previously rejected the argument that lack of drugs means there is no live controversy. *Jordan v. Fisher*, 823 F.3d 805, 809 n.4 (5th Cir. 2016). When other states have access to drugs, the court was not "convinced . . . it [was] absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* As other states and the federal government have recently carried out executions using drugs included in the DOC's current protocol, a case and controversy remains.[68]

### C.    Plaintiffs have Stated a Claim and Any Insufficiency will be Cured by Amendment

This Court should deny the Defendants' Motion to Dismiss, Rec. Doc. 263, because the Intervenors' Complaint states a claim on which relief can be granted. The Motion to Dismiss fails to accept the allegations in the Intervenors' Complaint, Rec. Doc. 253, as true, and fails to show that the allegations do not state a claim on their face and that there is no possibility that discovery could lend support to the claims or their elements. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

Defendants assert that now that the stay has been lifted, the Court should dismiss Plaintiffs' claims for failure to meet the pleadings standard for method-of-execution claims. Rec. Doc. 263-1, at 4-5. However, it is precisely *because* the stay was in place for so many years that some of Plaintiffs' claims must be amended to reflect the jurisprudential developments in the method-of-execution context. This Court has already scheduled the amended complaint deadline

---

[67] Ex. 3, LeBlanc Depo. Tr. 18:22-19:24. In fact, an execution date was set as recently as August 19, 2019 as discussed *supra* fn 59.
[68] Ex. 18 (Current DOC protocol); *supra* fn 13.

for January 7, 2022, so any dismissal of the pending claims prior to amendment would be premature.[69]

### 1. Plaintiffs Have Stated an Eighth Amendment Claim and the Amended Complaint Will Address *Glossip*

Dismissal of Plaintiffs' Eighth Amendment claims are premature as the amended complaint will satisfy the requirement of *Glossip v. Gross*, 576 U.S. 863 (2015) and *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019), that Plaintiffs plead a feasible and readily implementable alternative method of execution that would significantly reduce a substantial risk of severe pain.[70]

Contrary to Defendants' assertions, Plaintiffs have sufficiently pled that the current method of execution poses a substantial risk of serious harm. Plaintiffs' factual assertions lead to a reasonable inference that the lack of safeguards in the current protocol creates a substantial risk of serious harm to prevent a botched execution. These allegations are based on many articulable facts, including that Louisiana has repeatedly revised its execution protocols on the eve of execution dates, which does not leave time to provide adequate training to the execution team. Rec. Doc. 253 ¶¶ 38, 67, 156-165. The protocols do not provide adequate safeguards against constitutional violations; for example, there is a general lack of oversight of the execution, *id.* at ¶¶ 126-127, 146, a lack of details in the execution protocols such as the timing for administering

---

[69] Plaintiffs do not oppose dismissal based on the law of the case for the procedural due process claim and the damages claim but, in light of the upcoming deadline for the amended complaint, opposition to these claims is premature as they will be cured in the forthcoming complaint. Plaintiffs also do not materially oppose dismissal of the claim under the Louisiana Administrative Procedures Act based on Defendants' time-barred argument nor dismissal of the Public Access to Executions claim on the basis of Defendants' standing argument. However, again, Plaintiffs will shortly be amending the complaint to cure these deficiencies.

[70] The addition of the alternative method of execution in the forthcoming amended complaint will cure deficiencies Defendants allege in their brief in Sections II.B (1) and II.F. *See* Rec. Doc. 263-1, at 9-11, 19-20.

drugs, *id.* at ¶ 152, a lack of training, *id.* at ¶¶ 147-151, 154, 156-159); and a lack of a review of the individual medical needs of the condemned. *Id.* at ¶ 153.

Plaintiffs have also pled sufficient facts to lead to a reasonable inference that the use of the drugs identified in the current protocol creates a substantial risk of serious harm. Intervenors' Complaint pleads numerous articulable facts including that pentobarbital is slow to take effect, is not commonly used for general anesthesia, is a poor substitute for sodium thiopental, and is unsubstantiated by scientific evidence about its effects. *Id.* at ¶¶ 78–80, 83. Regarding the midazolam-hydromorphone protocol, Intervenors' Complaint also pleads numerous articulable facts that the use of those drugs individually and in combination will lead to a substantial risk of serious harm. Louisiana is the only state in the country that currently has a two-drug protocol of 10mg midazolam and 40mg hydromorphone, *id.* at ¶ 98, and both instances of prior uses of a two-drug midazolam-hydromorphone protocol resulted in botched executions. *Id.* at ¶¶ 99-102. Individually, midazolam is not an anesthetic, is not approved by the FDA for use as an anesthetic in surgical procedures, is subject to a "ceiling effect," and carries a substantial risk of paradoxical reaction, especially when administered in high doses to individuals with a history of aggression or impulsivity, a history of alcohol abuse, or other psychiatric disorders. *Id.* at ¶¶ 89–94. On its own, hydromorphone, is not an anesthetic, and may cause a paradoxical effect of hyperalgesia, or abnormal pain sensitivity, as well as anxiety. *Id.* at ¶¶ 95-97.

Defendants' citation to *Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020) is inapposite as that case was before the Court on an application for stay and was being evaluated under the much higher standard required in that posture – likelihood to succeed on the merits. By contrast, Plaintiffs are merely required to allege enough information that, *with discovery*, they could prove the Eighth Amendment violation. *See Flagg v. Stryker Corp.*, 647 Fed. Appx. 314, 317-18 (5th

Cir. 2016) (citing *In re So. Scrap Material Co. LLC v. ABC Ins. Co.*, 541 F.3d 584, 587)). Plaintiffs have met this standard.

### 2. Attempts to Dismiss Access to Courts and Equal Protection Claims are Precluded by Law of the Case

Plaintiffs' equal protection and access claims have already been tested via motion to dismiss. Rec. Doc 99, at 10, 12, 14. That those claims have been sufficiently pled is now law of the case. Unless "(i) the evidence on a subsequent trial was substantially different, (ii) controlling authority has since made a contrary decision of the law applicable to such issues, or (iii) the decision was clearly erroneous and would work . . . manifest injustice," this Court should not revisit the issues previously decided. *In re Ford Motor Co.*, 591 F.3d 406, 411-12 (5th Cir. 2009) (quoting *Propes v. Quarterman,* 573 F.3d 225, 228 (5th Cir. 2009)); *see also Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007). Defendants have neither argued nor established the foregoing, and this Court should adhere to the law of the case.

### 3. Access to Courts has Been Sufficiently Pled

Plaintiffs have satisfactorily pled a claim under the First, Sixth, or Fourteenth Amendments that Defendants' execution protocol denies them access to the courts. It is clear that prisoners have a constitutional right to meaningful access to the courts pursuant to the First and Fourteenth Amendments, as well as a Sixth Amendment right to counsel at all critical stages of a criminal proceeding. *See Bounds v. Smith*, 430 U.S. 817, 821-23, 828 (1977). The right to court access stands as an inmate's "most 'fundamental political right, because [it is] preservative of all rights.'" *Hudson v. McMillian*, 503 U.S. 1, 15 (1992) (Blackmun, J., concurring in the judgment) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)).

Louisiana is one of only a few states that neither expressly provides for the presence of counsel at an execution nor expressly allows the prisoner to choose a number of people to be present, whether by statute or protocol. In Louisiana, the execution protocol states that all visits to the condemned inmate must end by 3:00 p.m. on the day of the execution, but allows attorneys to stay with the inmate at the Warden's discretion.

During an execution, the only avenue allowing the condemned inmate access to the courts is the presence of counsel. Even the best prison law library would be meaningless to an inmate suffering extreme pain during an execution. Plaintiffs have an Eighth Amendment right not to be subjected to cruel and unusual punishment, and at no other time is that right more important than during execution. Plaintiffs' right to meaningful access to the courts in order to assert that right requires that counsel have access to the prisoner during the last hours before the execution, be permitted to witness the execution, and have access to a telephone until the execution has been carried out. Courts in other jurisdictions have recognized this right. *See Coe v. Bell*, 89 F. Supp. 2d 962, 966-67 (M.D. Tenn. 2000) (holding that the prison must provide the plaintiff with "access to his counsel during the last hour before the execution and to have his counsel witness the execution" and further that "counsel must have access to a telephone with an unimpeded outside line at the time that he or she witnesses the execution."), *vacated as moot*, 230 F.3d 1357 (6th Cir. 2000); *see also McGehee v. Hutchinson*, 463 F. Supp. 3d 870, 921-931 (E.D. Ark. 2020) (finding in Plaintiffs' favor on their right to access courts claim regarding the number of lawyers allowed to view the execution and access to a cell phone); *Cooey v. Strickland*, No. 2:04-cv-1156, 2010 U.S. Dist. LEXIS 81841, at *28 (S.D. Ohio Aug. 12, 2010) (holding that "Defendants' reliance on the protocol in refusing to permit Broom to speak with

22

counsel and in denying counsel's request to speak with Broom" established a facially plausible claim).

Defendants' citation to *Whitaker* for support that the Fifth Circuit has rejected similar claims[71] is unconvincing because of the difference between the claims. *Whitaker* plaintiffs' access to court claim was brought under the First, Sixth, and *Eighth* Amendments. *Whitaker v. Collier*, 862 F.3d 490, 501 (5th Cir. 2017). However, Plaintiffs bring this claim under the First, Sixth, and *Fourteenth* amendment. Therefore, *Whitaker*'s holding finding the plaintiffs had not satisfied the pleading requirement of *Glossip*, 862 F.3d at 501, is not applicable because Plaintiffs did not bring the access to courts claim under the Eighth Amendment.[72]

Further, *Whitaker* concerned the "right to counsel" and stated that the "Sixth Amendment right to counsel only 'extends to the first appeal of right, and no further.'" *Id.* (citing *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987)). Here, Intervenors' claim is a claim regarding *access* to the courts, not a *right to counsel*, which is distinct from the right to counsel, and addresses the requirement that prisoners be afforded "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Bounds*, 430 U.S. at 825. The correct question before this Court is whether Louisiana's "execution policies afford plaintiffs a reasonably adequate opportunity to present claimed constitutional violations during their executions." *McGehee*, 463 F. Supp. 3d at 925. Lastly, Plaintiffs here, unlike the *Whitaker* plaintiffs, will plead a sufficient underlying Eighth Amendment claim in the forthcoming amended complaint.

---

[71] *See* Rec. Doc. 263-1, at 22-23.
[72] Moreover, since the Fifth Circuit's decision in *Whitaker* on July 7, 2017, there have been a number of botched executions, showing that they are not "isolated mishaps." *See, e.g.*, *supra* fn 36.

Finally, the right to access to the courts cannot be restricted without some legitimate penalological justification. *See Turner v. Safley*, 482 U.S. 78, 89 (1987). The Defendants have offered none. Plaintiffs request that the Defendants' motion to dismiss this claim be denied, as the claim is plausible on its face. *See Twombly*, 550 U.S. at 570.

### 4. Equal Protection has Been Sufficiently Pled

Plaintiffs' have satisfactorily pled a claim under the Fourteenth Amendment that Defendants' execution protocol denies them equal protection under the law. "Because the death penalty is undeniably the most serious penalty available to a State, the procedures for such penalty must be implemented in a reasoned, deliberate, and constitutional manner." *Towery v. Brewer*, 672 F.3d 650, 653 (9th Cir. 2012). A "policy and pattern of deviations from the written execution protocol treat each condemned inmate differently, burdening his fundamental rights and constituting disparate treatment that is not rationally related in any way to a legitimate state interest." *Cooey v. Kasich*, 801 F. Supp. 2d 623 (S.D. Ohio 2011); *In re Ohio Execution Protocol Litig.*, 840 F. Supp. 2d 1044, 1058 (S.D. Ohio 2012). *Cf. Towery*, 672 F.3d at 653 (9th Cir. 2012) (finding that Arizona's practice of "amending its execution protocol on an ad hoc basis—through add-on practices, trial court representations and acknowledgments, and last minute written amendments—leaving the courts with a rolling protocol that forces us to engage with serious constitutional questions and complicated factual issues in the waning hours before executions . . . cannot continue.").

Defendants' misconstrue Plaintiffs' claim when they characterize it as "speculative." Plaintiffs' equal protection claim is that, *inter alia*, Defendants will fail to follow the protocol as written and will change the protocol immediately before an execution. These claims are not at all speculative, as Defendants have done both in the past. *See* Rec. Doc. 253, at ¶¶ 128-132 (listing

past core deviations from the written protocol including Defendants' failure to maintain the drugs in stock thirty days before the execution date and to conduct practice sessions at the indicated intervals); *id.* at 36 (noting that "Defendants amended the protocols on the day of Gerald Bordelon's execution (January 7, 2010), and 9 days before Christopher Sepulvado's execution date (February 5, 2014)"). But Plaintiffs' are not required to aver past deviations in their complaint to survive a motion to dismiss.

Plaintiffs have pled numerous facts in support of their claim that Louisiana's lethal injection protocol violates Equal Protection. Plaintiffs allege that the prison will fail to adhere to the written protocol, Rec. Doc. 253 ¶ 139; that the medication will not be effectively delivered to Plaintiff when he is executed, *id.* at ¶ 142; that the people who are carrying out the execution are not properly trained, *id.* at ¶¶ 147-165; and that the protocols lack the necessary specificity to ensure that they are carried out in a uniform fashion, *id.* at ¶¶ 133, 152. Based on Defendants' past practices, it is likely that if Plaintiffs are executed, each will be subject to disparate treatment through the use of different protocols. All of these facts support Plaintiffs' claims that Louisiana's lethal injection protocol will not be carried out in a uniform and equal way – thus violating the Equal Protection clause of the Fourteenth Amendment.

## CONCLUSION

For the reasons stated herein, Plaintiffs request that this Court deny the Defendants' Motion to Dismiss and allow this suit to proceed.

Respectfully submitted,

/s/ Cecelia Trenticosta Kappel
Cecelia Trenticosta Kappel, La. Bar No. 32736
Mercedes Montagnes, La. Bar No. 33287
The Promise of Justice Initiative
1024 Elysian Fields Avenue

New Orleans, LA 70117
Tel. (504) 529-5955
Fax (504) 595-8006

Michael D. Rubenstein (Bar No. 22860)
Liskow & Lewis
1001 Fannin Street, Suite 1800
Houston, TX 77002
Tel. (713) 651-2953
Fax (713) 651-2952

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and forgoing was filed electronically with the Clerk of Court using CM/ECF on this 31st day of December, 2021. Notice of this filing as generated by the electronic filing system constitutes service of the filed document on counsel for the Respondent.

/s/ Cecelia Trenticosta Kappel
Cecelia Trenticosta Kappel

26