## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

JESSIE HOFFMAN, *et al*

VERSUS

BOBBY JINDAL, *et al*

CIVIL ACTION

NO. 12-796-SDD-EWD

## <u>RULING</u>

Before the Court is Defendants' *Motion to Dismiss.*[1] The motion is opposed.[2] For the following reasons, Defendants' *Motion* shall be GRANTED.

## I.    BACKGROUND

On December 20, 2012, Louisiana death row inmate Jessie Hoffman filed a civil rights suit against the Governor, the Warden of Louisiana State Penitentiary, the Secretary of the Department of Public Safety and Corrections, the Department of Public Safety and Corrections (DPSC), the warden of death row, and unnamed executioners.[3] Hoffman alleged, *inter alia*, that Louisiana refused to disclose the lethal injection protocol it intended to use to carry out his execution.[4] Hoffman alleged that Louisiana's last known protocol, dated January 7, 2010, consisted of a three-drug combination of sodium thiopental, pancuronium bromide, and potassium chloride.[5] However, general counsel for the Department of Corrections (DOC) confirmed that DOC was not in possession of any sodium thiopental and could not obtain any from its pharmacy vendor.[6] Hoffman alleged that his execution would result in cruel and unusual punishment without the use of sodium

---

[1] R. Doc. 263.
[2] R. Doc. 305.
[3] R. Doc. 1.
[4] *Id.* at 10.
[5] *Id.* at 8.
[6] *Id.* at 12.

thiopental.[7] Hoffman sought to permanently enjoin his execution.[8] Death row inmate Christopher Sepulvado intervened in the suit on February 6, 2013.[9]

A hearing was held on Plaintiffs' preliminary injunction on February 7, 2013.[10] Plaintiffs' counsel confirmed that Defendants had not provided the execution protocol[11] and that DOC's response to intervenor Christopher Sepulvado's request for the protocol was that he could receive a copy after he had suffered an injury, i.e., after he was dead.[12] Defendants orally informed Plaintiff that they intended to use pentobarbital[13] but the Plaintiff received no other information about the change in protocol. The Court ruled from the bench that Plaintiffs had a Fourteenth Amendment due process right to access to the protocol. The Court also granted Plaintiffs' preliminary injunction and stayed Sepulvado's scheduled execution. [14] A written ruling followed.[15] On August 16, 2013, Plaintiffs filed an *Amended Complaint*.[16] The *Amended Complaint* alleged that Defendants had changed the lethal injection protocol from a three-drug cocktail to the use of a single injection of 5g of pentobarbital.[17] Plaintiffs' *Amended Complaint* alleged, *inter alia*, that the amended 2013 protocol would result in cruel and unusual punishment.[18]

---

[7] *Id.* at 12.
[8] *Id.* at 22.
[9] R. Doc. 10. Bobby Lee Hampton, Nathaniel R. Code, Kevan Brumfield, Todd Wessinger, Daniel Irish, Shedran Williams, Jarrell Neal, Daniel Joseph Blank, and James Tyler later intervened in the suit. R. Docs. 121, 122, 123, 198, 199, 200, 208, 209, 219.
[10] R. Doc. 37.
[11] *Id.* at 3.
[12] *Id.* at 6.
[13] *Id.* at 7.
[14] *Id.* at 21-23.
[15] R. Doc. 28.
[16] R. Doc. 67.
[17] *Id.* at 9-11.
[18] *Id.* at 15-18.

On August 30, 2013 the Fifth Circuit issued an opinion in *Sepulvado v. Jindal*,[19] reversing the preliminary injunction and stay of execution, holding that Sepulvado had no due process right to disclosure of Louisiana's lethal injection protocol, stating "Courts are not supposed to function as boards of inquiry with determining 'best practices.'"[20] When a new death warrant was issued for his execution,[21] Sepulvado again filed a *Motion for Stay of Execution*.[22] The parties consented to a stay of execution and issuance of a Temporary Restraining Order on February 3, 2014.[23]

Defendants filed a *Motion to Dismiss* the *Amended Complaint*, which was denied in part and granted in part on January 10, 2014.[24] Constrained by the binding precedent of *Sepulvado v. Jindal*, the Court dismissed Plaintiff's due process claim regarding access to the details of lethal injection protocol. The Court declined to dismiss Plaintiffs' Eighth Amendment claims, finding Plaintiffs alleged sufficient facts to state plausible claims in light of Supreme Court precedent.

On February 3, 2014, Plaintiffs filed a *Second Amended Complaint*.[25] Plaintiffs alleged that Defendants' discovery responses revealed their supply of pentobarbital expired as of September 2013[26] and the Louisiana Board of Pharmacy confirmed that the Louisiana State Prison pharmacy did not have any pentobarbital in stock.[27] Due to the lack of supply, Plaintiffs alleged Defendants would use compounded pentobarbital, in

---

[19] 729 F.3d 413 (5th Cir. 2013).
[20] *Id*. at 419 (internal citations omitted).
[21] R. Doc. 97, 98.
[22] R. Doc. 105.
[23] R. Doc. 119.
[24] Defendants, Governor Bobby Jindal and Department of Public Safety and Corrections, were dismissed from the suit in this order (R. Doc. 59).
[25] R. Doc. 118.
[26] *Id*. at 14.
[27] *Id*. at 15.

violation of Louisiana Administrative Code § § 46: LII.2303, 2305, 2535…"[28] Plaintiffs allege in their *Second Amended Complaint*, *inter alia*, that compounded pentobarbital "will likely result in a 'lingering death' in violation of the Eighth Amendment."[29]

On March 6, 2014 Defendants advised the Court that "the execution protocol is still being revised."[30] An execution protocol dated March 12, 2014 was produced in discovery, providing for two options: a single drug dose of 5mg pentobarbital; or a two-drug dose of 10mg midazolam and 40mg hydromorphone.[31] A series of consent orders were entered from March 6, 2014 to July 16, 2018 extending the Temporary Restraining Order staying the execution of Sepulvado and expanding it to include all Plaintiffs while the stay was in effect.[32] Requests for extending the stay prompted by Defendants urged, "facts and issues involved in this proceeding continue to be in a fluid state… it would be a waste of resources and time to litigate this matter at present."[33]

The meeting of the minds between the parties about the fluid state of affairs was disrupted around the time Attorney General Jeff Landry, whose in-house and retained counsel had consented to stays in this matter, issued a press release on July 18, 2018 blaming Governor Edwards for failing to move forward with executions in Louisiana:

Dear Governor Edwards:

---

[28] R. Doc. 118 at 5.
[29] *Id*. at 16. Plaintiffs also allege in their *Second Amended Complaint* that the 2013 lethal injection protocol was not reviewed by a licensed medical professional (*Id*. at 17); Defendants have made "core deviations" from the written 2013 protocol (*Id*. at 17); Plaintiff, Christopher Sepulvado, has medical conditions that make him susceptible to a greater risk of harm if the 2013 protocol is used (*Id*. at 18); the 2013 protocol does not contain adequate safeguards to protect Plaintiffs from cruel and unusual punishment (*Id*. at 19); the 2013 protocol prevents a meaningful access to counsel (*Id*. at 23); the 2013 protocol prevents a meaningful access to the public (*Id*. at 23); and changes in the execution protocol amount to ex post facto punishment (*Id*. at 24).
[30] R. Doc. 144.
[31] R. Doc. 305-18.
[32] R. Docs. 144, 155, 178, 184, 188, 197, 227.
[33] R. Docs. 196, 226.

Louisiana currently has over 70 inmates on death row awaiting execution and the State has not carried out a death sentence since 2010, even though a large and growing number of victims' families suffer in legal limbo waiting for justice to be carried out. I write today in support of those crime victims.

As you know, your legal counsel for the Department of Corrections (DOC) recently filed motions in federal court voluntarily agreeing to stay, and delay again, all executions for yet another year.

In light of your Administration's latest decision to not pursue justice for victims and their families and to unnecessarily tie the DOC's hands by ceding control to a federal court, I have directed DOJ attorneys to **withdraw** from further representing the DOC in this case. My decision does not come lightly or without exhaustive efforts to get your Administration to work with our team to bring our State's most monstrous criminals to justice.

When I took office, I was approached by several District Attorneys who expressed concern about DOC's failure to see that justice is carried out in cases their offices had prosecuted, all of which involved heinous crimes and many of which involved vicious assaults and murders of young children. I instructed attorneys in my office to work with the DOC to identify roadblocks and how we could facilitate moving past them.

I was informed of two specific obstacles: a legal obstacle arising from the pending litigation in *Hoffman v. Jindal* and an obstacle arising from difficulty in obtaining the necessary drugs. In an effort to find solutions on both fronts, I took several steps.

I involved DOJ attorneys from *Hoffman* and then convened meetings at DOC with interested Assistant District Attorneys, DOC staff, and DOC Secretary Jimmy LeBlanc to address the obstacles in obtaining the drugs, find ways to work around any impediments, and develop a concrete path forward.

At all of these meetings, we reaffirmed out willingness to bring whatever resources are necessary to help the DOC overcome any legal or logistical obstacles, to clear a path, and to permit justice to be carried out for these crime victims and their frustrated families.

Following research into compounding pharmacies and potential legal hurdles related to their use—we learned the DOC already has capacity to use a single-drug (Pentobarbital), which is the same drug recently used in Texas, Georgia, and Missouri. Additionally, we discussed legislation that could expand the State's options in the event drugs are not obtainable.

However, I discovered the biggest obstacle to getting justice for our State's crime victims was neither the federal case nor the difficulty obtaining drugs; it continues to be **your unwillingness to proceed with *any* executions.**

In the last two years—Texas, Florida, Georgia, Alabama, Missouri, Ohio, and Virginia have all navigated similar obstacles and successfully carried out sentences of execution. In April 2017, Arkansas carried out two executions in one day. And in the first six months of this year, Texas carried out seven executions. Alabama, which carried out two executions this year, recently expanded its options to include electrocution, nitrogen hypoxia, and lethal injection. A legal challenge in Alabama similar to the one lodged here was recently dismissed as moot after Alabama expanded its law. Missouri likewise authorizes the use of lethal gas, and several states permit death by hanging or firing squad.

All of this begs the question that only you can answer: why do victims' rights matter in Texas, Florida, Georgia, Alabama, Arkansas, Ohio, and Virginia, but not in Louisiana?

I remain committed to fighting for our crime victims and their families, who have already waited too long to see justice carried out. I encourage you to change your position and work with the DOJ to see justice carried out.

For Louisiana,
Jeff Landry
Attorney General[34]

The day before the press release was issued, the Attorney General's in-house attorneys filed motions to withdraw in this matter.[35] The Attorney General then filed a *Motion to Intervene*, asserting that his interest was not adequately represented by the existing parties in the suit.[36] On August 1, 2019 the Court extended the stay until the pending motion to intervene was addressed.[37] On June 8, 2021, the Court denied the motion to intervene and lifted the stay, finding that the Attorney General already represented Defendant, DPSC Secretary LeBlanc, in these proceedings.[38] The Court

---

[34] R. Doc. 305-14 at 5-7.
[35] R. Doc. 228.
[36] R. Docs. 232, 233.
[37] R. Doc. 236.
[38] R. Docs. 254, 256.

pointed out that a divergence of opinion seemed to have emerged between "outside counsel retained by the Attorney General, the highest-ranking attorneys in the Attorney General's Office, and the Attorney General himself."[39]

On August 12, 2021 Defendants filed the pending *Motion to Dismiss* contending: (1) the Court lacks subject matter jurisdiction because DOC has no ability to obtain lethal injection drugs authorized by the current protocol nor any other lethal injection drugs for the foreseeable future; (2) the Intervenor-Plaintiffs fail to state a claim for procedural due process, an Eighth Amendment violation, a Fourteenth Amendment violation, deviations from execution protocol, potential use of compounded execution drugs, combination of execution drugs, substitution of lethal injection drugs, access to courts and counsel, public access to executions, and damages; and  (3) the Plaintiffs fail to state a claim under the Louisiana Administrative Procedures Act. Defendants attached two affidavits to their motion: Secretary James LeBlanc and Seth Smith. These affidavits aver facts supporting the contention that DOC is unable to procure the drugs necessary to perform executions for the foreseeable future.

Plaintiffs filed a *Motion for Jurisdictional Discovery* on September 20, 2021.[40] Plaintiffs argued that discovery had been stayed in the matter since 2014 and they had no means of determining whether the representations in the affidavits submitted by Defendants were true.[41] Over Defendants objection,[42] the Court granted limited jurisdictional discovery to be completed by December 14, 2021.[43] On December 6, 2021

---

[39] *Id.* at 9.
[40] R. Doc. 270.
[41] R. Doc. 270-1.
[42] R. Doc. 279.
[43] R. Doc. 299.

Defendants filed a Motion for Leave to Substitute Exhibits to Motion to Dismiss, seeking to substitute the affidavits of Secretary LeBlanc and Seth Smith.[44] As explained in Defendants' motion, Paragraphs 12 and 13 of Secretary LeBlanc's affidavit and Paragraph 5 of Seth Smith's affidavit required "clarification/correction."[45] Indeed, these paragraphs better explained the nuances involved in DOC's inability to obtain the lethal injection drugs in more detail than the original affidavits. The motion was granted on December 16, 2021.[46]

Plaintiffs filed an opposition to Defendants' *Motion to Dismiss* on December 31, 2021, attaching various exhibits, including the depositions of Secretary LeBlanc, Seth Smith, Jonathan Travis, and Mary Labatut.[47] Plaintiffs dispute Defendants' position that the Court lacks subject matter jurisdiction, contending Defendants could change their behavior regarding procuring lethal injection drugs at any time. In *Reply*, Defendants assert that Plaintiffs misrepresent the deposition testimony and reiterate their position that DOC cannot obtain the drugs essential to carry out executions and Plaintiffs have failed to state a claim upon which relief can be granted.[48]

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) allows defendants to assert by motion "lack of subject-matter jurisdiction." Lack of subject-matter jurisdiction may only be found in: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the

---

[44] R. Doc. 302.
[45] R. Doc. 302-1.
[46] R. Doc. 304.
[47] R. Doc. 305.
[48] R. Doc. 309

8

court's resolution of disputed facts."[49] The party asserting jurisdiction has the burden of proof on a 12(b)(1) motion to dismiss, which means that in this case the plaintiffs bear "the burden of proof that jurisdiction does in fact exist."[50]

"The exercise of judicial power under Art. III of the Constitution depends on the existence of a case or controversy."[51] "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."[52] The doctrine of mootness is a jurisdictional matter.[53] "A claim is moot when a case or controversy no longer exists between the parties."[54] Mootness "can arise in one of two ways: First, a controversy can become moot 'when the issues presented are no longer 'live.' A controversy can also become moot when 'the parties lack a legally cognizable interest in the outcome."[55] The mootness doctrine "applies to equitable relief."[56] Because here the plaintiffs seek an injunction, the mootness doctrine applies here. [57]

---

[49] *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)).

[50] *Id.* (citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)).

[51] *Preiser v. Newkirk,* 422 U.S. 395, 401 (1975).

[52] *Id.* at 401.

[53] *Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 345 (5th Cir. 2017) ("Mootness is a jurisdictional matter which can be raised for the first time on appeal.") (quoting *Texas Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 204 (5th Cir. 2010)).

[54] *Brinsdon*, 863 F.3d at 345 (citing *Bd. of Sch. Comm'rs v. Jacobs*, 420 U.S. 128, 129, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975)).

[55] *Chevron U.S.A. v. Traillour Oil Co.*, 987 F.2d 1138, 1153 (5th Cir. 1993) (internal citations and quotation marks omitted).

[56] *Brinsdon*, 863 F.3d at 345 (citing *Morgan v. Plano Indep. Sch. Dist.*, 589 F.3d 740, 748 n.32 (5th Cir. 2009)).

[57] Defendants argue the doctrine of "ripeness." Ripeness, like mootness, is a justiciability doctrine, the basic rationale of which is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements. For these reasons, a ripeness inquiry is often required when a party is seeking *pre-enforcement* review of a law or regulation. *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 545 (5th Cir. 2008). Mootness, on the other hand, occurs when a set of circumstances after the commencement of the lawsuit eliminates the actual controversy. See *Ctr. for Individual Freedom v. Carmouche,* 449 F.3d 655, 661 (5th Cir.2006). Because a controversy existed at the inception of this litigation, the court's jurisdiction is appropriately analyzed under the mootness doctrine. In any event, Defendants argue the Court lacks subject matter jurisdiction because there is no case or controversy and because it implicates jurisdiction, the Court is obligated to raise mootness *sua sponte. Hinkley v. Envoy Air, Inc.*, 968 F.3d 544, 548 (5th Cir. 2020).

III.    **ANALYSIS**

A. **Setting the Record Straight**

Starting in 2016, the Louisiana Department of Public Safety & Corrections began receiving letters from major pharmaceutical manufacturers announcing their policy on the use of their drugs for capital punishment. DPSC received a letter from Pfizer's Vice President of Government Relations on August 9, 2016, stating (in part):

> …With its acquisition of Hospira, Pfizer acquired certain products that may be used in lethal injection for capital punishment, and like Hospira before it, strongly objects to the use of any of our products in the lethal injection process for capital punishment.
>
> Under Pfizer's Corporate Policy for Use of Our Products in Lethal Injections for Capital Punishment, seven products (potassium chloride, propofol, midazolam, hydromorphone, pancuronium bromide, rocuronium bromide, and vercuronium bromide) are considered "Restricted Products" and are not to be sold to correctional facilities or other affiliated organization where they may be misused for lethal injection. Pfizer recently implemented an enhanced restricted distribution protocol for the Restricted Products to help combat this unauthorized use… We request that you return to us any Hospira or Pfizer manufactured Restricted Product listed above in your possession…[58]

DPSC received similarly worded letters from Sandoz, Alvogen, and Hikma.[59] Louisiana was not singled out by the pharmaceutical companies. When Pfizer announced its policy in 2016, all FDA-approved manufacturers of any potential execution drug had blocked their sale for the purpose of capital punishment.[60] Federal courts, including the United States Supreme Court, have recognized the ongoing trend of the pharmaceutical companies' unwillingness to supply lethal injection drugs to states for use in executions.[61]

---

[58] R. Doc. 309-3 at 1.

[59] *Id.* at 2-8.

[60] https://www.nytimes.com/2016/05/14/us/pfizer-execution-drugs-lethal-injection.html.

[61] G*lossip v. Gross*, 576 U.S. 863, 869-871 (2015); *Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 853, 879 (11th Cir. 2017); *In re Ohio Execution Protocol*, 860 F.3d 881, 885 (6th Cir. 2017); *McGehee v. Texas Dep't of Crim. Just.,* No. MC H-18-1546, 2018 WL 3996956, at *3 (S.D. Tex. Aug. 21, 2018) (States have taken two approaches to losing suppliers of manufactured pentobarbital. First, States like Texas have

In 2018, Alvogen successfully prevented Nevada from using midazolam in the execution of Scott Raymond Dozier because the Nevada Department of Corrections surreptitiously obtained the drug from a wholesale distributor in direct violation of its restricted drug policy.[62] Alvogen put Nevada on notice of its policy regarding the use of its drugs in lethal injections through a letter dated April 20, 2018, which was sent to every state that has the death penalty. Louisiana DPSC received the same letter from Alvogen.[63]

DPSC Secretary James LeBlanc testified about the roadblocks encountered in carrying out lethal injection in Louisiana. He has received letters from several major pharmaceutical companies which articulate an unwillingness to supply drugs that could be used lethally. This creates a dilemma with respect to treating the medical needs of the rest of the prison population. LeBlanc testified that the way to move forward with executions in Louisiana is legislatively. However, legislative efforts to change the means of execution have failed. Legislative efforts to maintain the secrecy of the source of the drugs have failed. Legislative efforts to do away with the death penalty have also failed.[64] According to Secretary LeBlanc, "[i]f we want to continue to execute, then we need to have a way to do it that can be carried out."[65]

---

acquired pentobarbital from compounding pharmacies that have attempted to keep their identity secret. Other states, like Arkansas, "have turned to midazolam, a sedative in the benzodiazepine family of drugs." In 2015 Arkansas amended its method-of-execution statute to authorize the use of midazolam as part of a three-drug protocol. Since *Glossip*, there have been at least twenty executions carried out in Florida, Alabama, Virginia, Ohio, Tennessee, and Arkansas using midazolam).

[62] https://deathpenaltyinfo.org/files/pdf/Gonzalez_Dozier_Injunction.pdf
[63] R. Doc. 309-3 at 2
[64] R. Doc. 305-3 at 20-21; 38.
[65] R. Doc. 305-3 at 32-33.

Secretary LeBlanc testified that the DOC struggles with drug procurement.[66] The letters from various pharmaceutical companies say "if you execute, the supply line will be cut off or that's not what we produce drugs for. It's usually incorporated in the letter, it's to heal not—not to execute. So, it, you know, that's the general statement – in those letters. It's pretty consistent, I think, across the board, and that it jeopardizes…purchase of drugs that we need for our population."[67] Secretary LeBlanc testified that the DOC does not want to jeopardize healthcare[68] and is not going to risk the prison population by underhandedly purchasing drugs.[69] "…[T]here's been accusations…all over the world about how states are getting their drugs. But we've been pretty straight up about it, I think."[70] Secretary LeBlanc testified that if a death warrant was issued, the DOC would make attempts to obtain the drugs legally, but so far that has not occurred; they have not been able to purchase the drugs without risking the loss of medications needed for the health of the prison population.[71]

Morris & Dickson is LSP's contracted pharmaceutical distributor.[72] On August 3, 2018 Mary Labatut, LSP's Pharmacy Director,[73] and LSP's Medical Director, Randy Lavespere, M.D., signed a contract with Morris & Dickson in order to obtain drugs on the "restricted list," including: pancuronium bromide, potassium chloride, propofol, diprivan, midazolam, hydromorphone, rocuronium bromide, diazepam, fentanyl, amidate,

---

[66] *Id.* at 21.
[67] R. Doc. 309-4 at 11-12.
[68] *Id.* at 14.
[69] *Id.* at 10.
[70] *Id.* at 10.
[71] *Id.* at 10-11.
[72] R. Doc. 309-5 at 9-10.
[73] R. Doc. 305-6 at 7-8

etomidate, and atracurium. To obtain these restricted drugs, Labatut and Lavespere were required to certify that LSP would:

> [O]nly use medications for their intended purpose for the legitimate medical treatment of our patients. In accordance with the agreement, [the restricted drugs] shall not be used for administration in capital punishment here at Louisiana State Penitentiary or re-distributed to any other associated correctional institution.[74]

As a result of the certification, LSP has been able to obtain some of the restricted drugs, but only for healthcare purposes.[75] Labatut testified that she could not order lethal injection drugs through wholesalers other than Morris & Dickson.[76] Labatut testified, "[b]ecause we signed a contract not to use those drugs. I am out of the execution medication business."[77]

Jonathan Travis, pharmacy director at Elayn Hunt Correctional Center, testified that if DPSC uses the restricted drugs in lethal injections that it could jeopardize its ability to get drugs needed for treatment and healthcare in the future.[78] Travis testified that he believes that if they use a restricted drug for lethal injection the company will restrict their access to all drugs.[79] The 2018 certification came about because for months they were not able to acquire the restricted drugs for day-to-day purposes.[80] They reached out to Morris & Dixon because access was really needed to the restricted drugs for medical treatment of patients.[81] Once the certifications were signed, they have had access to the restricted drugs for medical purposes.[82] Travis also signed a certification. Travis is under

---

[74] R. Doc. 309-8.
[75] R. Doc. 305-6 at 16.
[76] R. Doc. 309-5 at 19.
[77] *Id.* at 13.
[78] R. Doc. 309-6 at 10-11.
[79] *Id.* at 15-16.
[80] *Id.* at 16-18.
[81] *Id.* at 16.
[82] *Id.* at 18.

the impression that any other drug wholesaler would also not sell a restricted drug to DPSC without a similar certification.[83]

Seth Smith is the chief of operations at DOC.[84] Smith testified that once the supply of execution drugs that were obtained in 2014 expired, the DOC has never obtained any more.[85] Like his colleagues, Smith testified that the DOC has had to sign contracts with the distributors of the medications and if DOC were to use the medications it runs the risk of losing access to medications.[86] Smith testified, "[t]he pursuit of execution does not outweigh the well-being and healthcare that we have to provide for the other roughly 26-27,000 offenders…[87] [t]here are drugs in stock that definitely could be used to execute but we cannot use them in that fashion."[88] Smith testified that Secretary LeBlanc has made a decision that using these drugs to execute people is not worth the risk of jeopardizing the ability to get drugs needed for the health and treatment of inmates.[89] Smith testified that if an execution warrant was issued, they would reach out to the pharmacies within the DOC system and ask if they could obtain the drugs in the protocol. "And the answer is going to be no. And then at that point, we're just going to have to say we can't."[90]   Smith testified that unless the law is changed, DOC is unable to carry out an execution legally in Louisiana.[91]

At one time, Smith contacted a compounding pharmacy in Oklahoma, but there was concern over a legal issue of whether an out of state pharmacy could be used. Also,

---

[83] R. Doc. 309-6 at 21.
[84] R. Doc. 305-4 at 8.
[85] *Id.* at 10.
[86] *Id.* at 14.
[87] *Id.* at 14.
[88] *Id.* at 14.
[89] R. Doc. 309-7 at 17.
[90] R. Doc. 305-4 at 15.
[91] *Id.* at 15.

a media outlet exposed the contact through a public records request and the source became unobtainable.[92] He made quite a few contacts with compounding pharmacies throughout the region, but the media attention dissuaded interest.[93] One deal fell through with a Louisiana pharmacy because the raw materials suddenly became unavailable; another because the pharmacy closed.[94] He has not continued to reach out to the same potential sources because nothing has changed.[95] No one is willing to sell Louisiana DOC the drugs, compounding or otherwise.[96]

The depositions in this matter revealed that Attorney General Landry's press release misrepresented DOC's supply and access to lethal injection drugs. DOC does not have access to pentobarbital.[97] Secretary LeBlanc and Seth Smith also testified about the meetings referenced in the press release. Secretary LeBlanc described the meeting he attended as "crazy, strange"[98] where a group of district attorneys wanted to discuss restarting executions.[99]  Seth Smith testified that he also attended the meeting.[100] "There was a group of people that made some very ridiculous suggestions as to how we go about executing people. Like, using street drugs. You know I think they maybe even mentioned bleach. I mean, just if you want to do it, you can do it, there's a way, and went on to suggest ways that just are not feasible. That's what I recall. It was really a—I don't want to use that word. I was a – it was a circus."[101]

---

[92] R. Doc. 305-4 at 23.
[93] R. Doc. 309-7 at 7.
[94] *Id.* at 7.
[95] R. Doc. 309-7 at 7.
[96] *Id.* at 27-28.
[97] R. Doc. 305-3 at 22; R. Doc. 305-4 at 22.
[98] R. Doc. 305-3 at 27.
[99] *Id.* at 23-27.
[100] R. Doc. 305-4 at 28.
[101] *Id.* at 29.

The case law also establishes that the states mentioned in Attorney General Landry's press release that have continued executions are in a substantially different situation than Louisiana. In 2009 Texas changed its execution protocol to a single dose of pentobarbital, which it obtains from compounding pharmacies.[102] In 2015, the Texas legislature exempted lethal injection drug suppliers from the Public Information Act disclosure.[103] In 2018 savvy reporters were able to discover and publicize the name of one Texas compounding pharmacy provider with a history of serious safety violations despite this confidentiality law.[104]  Virginia,[105] Georgia, and Missouri use compounding pharmacies.[106] Arkansas law specifically permits the use of compounding pharmacies.[107] Since Attorney General Landry's press release, Governor DeWine of Ohio has issued reprieves and indefinitely suspended executions because of Ohio's inability to procure lethal injection drugs.[108]

It is also important to note that Plaintiffs misrepresented the deposition testimony in their brief to this Court, stating "[t]he subsequent depositions of Secretary LeBlanc, Seth Smith, Jonathan Travis, and Mary Labatut established that while DOC has made a judgment that it will not use manufactured drugs in executions in order to ensure the ability to purchase drugs to treat patients within its prisons upon being served  with an execution

---

[102] *McGehee v. Texas Dep't of Crim. Just.,* 2018 WL 3996956, at *7 (S.D. Tex. Aug. 21, 2018).
[103] *Id.*
[104] https://www.buzzfeednews.com/amphtml/chrismcdaniel/inmates-said-the-drug-burned-as-they-died-this-is-how-texas?__twitter_impression=true
[105] *Virginia Dep't of Corr. v. Jordan*, No. CV 3:17MC02, 2017 WL 5075252, at *7 (E.D. Va. Nov. 3, 2017).
[106] *Jordan v. Comm'r, Mississippi Dep't of Corr.,* 947 F.3d 1322 (11th Cir.); Georgia and Missouri have confidentiality laws: Ga. Code Ann. §42-5-36(d)(2); Mo. Rev. Stat. 546.720.
[107] Ark. Code Ann. 5-4-617(d); Arkansas also has a confidentiality law: Ark. Code Ann. §5-4-617. Florida, likewise, has secrecy laws protecting the identity of its drug suppliers: Fla. Stat. Ann. §945.10.
[108] https://governor.ohio.gov/media/news-and-media/gov-dewine-issues-reprieve;
https://governor.ohio.gov/media/news-and-media/reprieves-issued-on-jan-31
https://governor.ohio.gov/media/news-and-media/Governor-DeWine-Issues-Reprieves-02182022
https://deathpenaltyinfo.org/news/ohio-governor-mike-dewine-calls-lethal-injection-a-practical-impossibility-says-state-will-not-execute-anyone-in-2021

warrant, the DOC would take whatever steps need to be taken in order to carry out its execution protocol."[109] "Defendants have demonstrated they will make last-minute herculean efforts to access pentobarbital and/or hydromorphone… in the event a death warrant is issued."[110] In fact, all four witnesses testified that DOC would not be able to obtain the drugs to carry out an execution.[111] Mary Labatut, Jonathan Travis, and Seth Smith testified that they would refuse an order to improperly obtain execution drugs because they are bound by the certification.[112]

**B. Plaintiffs' Claims Are Moot**

When Plaintiffs filed suit in December of 2012, the claims were ripe for review. The DPSC protocol called for a three-drug protocol that included sodium thiopental, but DPSC admitted that it had no sodium thiopental in stock.[113] Plaintiff, Christopher Sepulvado, was scheduled for execution on February 13, 2013 and again on March 7, 2014.[114] Defendants had refused to respond to Sepulvado's efforts to obtain information about the method in which they intended to execute him.[115] Plaintiffs alleged that their impending executions would violate the Eighth Amendment and that Defendants' refusal to provide them with information about the protocol violated the Fourteenth Amendment.

Defendants advised Plaintiffs in 2013 that the protocol had been altered to include a single injection of 5g of pentobarbital and again in 2014 to include an alternate method using 10mg of midazolam and 40mg of hydromorphone. Plaintiffs amended their complaint twice as the facts evolved, but a controversy remained: whether Plaintiffs were

---

[109] R. Doc. 305 at 3.
[110] *Id.* at 10.
[111] R. Doc. 309-4 at 10-11; R. Doc. 309-5 at 13-14; R. Doc. 309-6 at. 12-13; R. Doc. 305-4 at 15.
[112] R. Doc. 309-5 at 13-14; 17; R. Doc. 309-6 at 12-13; R. Doc. 305-4 at 15.
[113] R. Doc. 14-1,
[114] R. Doc. 15; R. Doc. 98
[115] R. Doc. 14.

entitled to details about the execution protocol and whether the protocol, as applied, was constitutional.  As mentioned above, the parties mutually agreed to successive stays in this matter from February 3, 2014 until Attorney General Landry attempted to intervene in 2019.

The circumstances have changed considerably since Plaintiffs filed their *Complaint* in 2012, best summarized by Secretary LeBlanc's affidavit (in part):

> 6. For the last several years DPSC has had extreme difficulty in obtaining drugs that could be used for executions. By early 2013, DPSC no longer had a stock of, no access to, the other drugs in the lethal injection sequence- pancuronium bromide and potassium chloride. The protocol was later revised to provide for a single dose of 5g pentobarbital, which has since become the most widely-used method of execution in the country and was adopted by the Federal Bureau of Prisons in 2019.

> 7. DPSC's stock of pentobarbital expired in the fall of 2013 before it could be utilized for any executions.

> 9. … The current protocol was last revised on March 13, 2014 and continues to provide for a single dose of pentobarbital or, if that drug is not available, a combination of midazolam and hydromorphone.

> 10. The current protocol has yet to be implemented for any execution in Louisiana. Meanwhile DPSC's stock of hydromorphone and midazolam that were to be utilized under the current protocol in 2014 has since expired.

> 11. To this date, DPSC remains unable to procure either pentobarbital or hydromorphone.

> 12. DPSC has received multiple correspondence from pharmaceutical companies prohibiting the use of their products for lethal injection. In 2018, DPSC executed a certification to Pfizer and its wholesaler (Morris & Dickson) in order to access potential execution drugs solely for the medical care needs of its inmate population. The drugs DPSC obtains from these companies are necessary to the provision of health care for its inmate population, and without certification, DPSC would not be able to access these drugs; therefore it cannot risk violating the certification. While DPSC has been able to acquire midazolam, it is strictly for use in medical procedures such as colonoscopies.

18. In light of the circumstances outlined above, DPSC is presently unable to procure any drugs that could be used for lethal injection and will not be able to do so in the foreseeable future. Should a death warrant be issued in the future, DPSC will not be able to carry out the order for lack of access to lethal injection drugs.[116]

Defendants contend that these factual developments since the inception of the lawsuit have divested the Court of subject-matter jurisdiction. Plaintiffs, on the other hand, make several arguments against dismissal. Plaintiffs contend that Secretary LeBlanc has no discretion to refuse to carry out an execution if a warrant is issued and dismissing the lawsuit would only "facilitate last-minute, potentially dangerous changes in DOC's protocol under the cover of darkness and without judicial oversight."[117] Plaintiffs argue the "protocol can change at any moment"[118] and their "challenges are not limited to just the three drugs that are currently authorized under the protocol."[119] Plaintiffs also argue that DPSC has made a policy decision to suspend executions.[120]

The Court finds Plaintiffs' arguments unavailing. The only legal method of execution in the State of Louisiana is lethal injection.[121] While the Secretary of the Department of Corrections is tasked with carrying out a death warrant, he is not required to do so by any means necessary. Indeed, the Secretary may only "cause the execution of the condemned *as provided by law*."[122] The uncontroverted testimony in this matter has established that Louisiana is unable to obtain execution drugs from compounding pharmacies[123] or FDA-approved pharmaceutical companies. The pharmaceutical

---

[116] R. Doc. 263-2
[117] R. Doc. 305 at 5-6.
[118] *Id.* at 7.
[119] *Id.* at 8.
[120] *Id.* at 5-6.
[121] LSA-RS 15:569.
[122] LSA-RS 15:567(B).
[123] Plaintiff's *Second Amended Complaint* alleges that Louisiana's use of compounding pharmacies would violate Louisiana Administrative Code §§ 46: LIII. 2303, 2305, and 2535 (R. Doc. R. Doc. 118 at 5).

companies have successfully leveraged their power of access to life-saving drugs over the DOC. DPSC's wholesale distributor required a contract with LSP for access to the restricted drugs with a specific requirement that LSP not engage in capital punishment. In sum, DPSC is at the mercy of drug suppliers who simply will not sell their products for use in lethal injection.

Plaintiffs' speculation about what Defendants may do "under the cover of night" or what drug they may use if an execution warrant is issued at some uncertain time in the future illustrates the difficulty the Court would have in reviewing a claim in which the factual circumstances are unknown and do not present a concrete and definite controversy. How can the Court meaningly evaluate whether Defendants' execution protocol violates the Plaintiffs' constitutional rights if no party to this suit even knows how, when, or if any Louisiana death row inmate will be executed? Any analysis the Court conducts would be a purely academic exercise. The barriers and uncertainty facing Louisiana's lethal injection protocol deprive Plaintiffs' claims of the immediacy and reality required to establish a present, live controversy of the kind that must exist to avoid advisory opinions on abstract propositions of law.[124]

Plaintiffs' claims do not fall into the exception to mootness for claims that are capable of repetition, yet evading review. The exception can be invoked if two elements are met: "(1) [T]he challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same

---

[124] *Hall v. Beals,* 396 U.S. 45, 48 (1969). Plaintiffs' argument that fn. 4 in *Jordan v. Fisher,* 823 F.3d 805 (5th Cir. 2016) suggests that this case is not moot is also unavailing. As discussed at length herein, many events have transpired since 2016, within State of Louisiana and nationwide, between pharmaceutical companies and death penalty jurisdictions that have effectively blocked access to lethal injection drugs. Also, given the testimony and affidavit submitted by Secretary LeBlanc, this case is distinguishable from *Fisher.*

complaining party would be subjected to the same action again."[125] Under the exception's "capable of repetition" prong, Appellants "must show either a 'demonstrated probability' or a 'reasonable expectation,'"[126] that they will "be subject to the same [unlawful governmental] action again,"[127] A "mere physical or theoretical possibility" is not sufficient to satisfy this prong of the exception.[128]

Given the Defendants' virtual inability to obtain lethal injection drugs, Plaintiffs cannot demonstrate a reasonable expectation that Defendants will resume executing prisoners without significant and substantial changes to the execution protocol or the law. Also, Plaintiffs cannot demonstrate that the duration of the violation is such so short that a future action could not be fully litigated without becoming moot. Indeed, if a live controversy re-emerges, Plaintiffs may employ the same procedural mechanisms they have previously used to seek the relief they desire.[129]

Lastly, the Court will address Plaintiffs' argument that Defendants have made a policy decision to voluntarily cease obtaining lethal injection drugs. To the extent that Defendants' policy could be characterized as voluntary cessation, this argument too fails. A plaintiff bears the burden to prove that the Court has jurisdiction, but when a defendant asserts mootness, the defendant sometimes maintains a burden to establish that mootness exists. Defendants retain such a burden to establish mootness when the defendants voluntarily cease the conduct that the plaintiff is challenging. This exception

---

[125] *Weinstein v. Bradford,* 423 U.S. 147, 149 (1975).
[126] *Oliver v. Scott,* 276 F.3d 736, 741 (5th Cir.2002).
[127] *Weinstein v. Bradford,* 423 U.S. 147, 149 (1975).
[128] *Murphy v. Hunt,* 455 U.S. 478, 482 (1982).
[129] In *Sepulvado v. Jindal*, the Fifth Circuit found Sepulvado's request for a stay of execution was "impermissibly dilatory." 729 F.3d 413, 421 (5th Cir. 2013). As the Defendants' actions have mooted this case, the same reasoning would not apply if the Court reattained subject matter jurisdiction.

to the mootness doctrine is known as the "voluntary cessation doctrine."[130] When the

defendant is a government entity, it retains this burden. But in such cases the Fifth Circuit

modifies this burden slightly, giving the government defendant some benefit of the doubt:

> On the other hand, courts are justified in treating a voluntary
> governmental cessation of possibly wrongful conduct with
> some solicitude, mooting cases that might have been allowed
> to proceed had the defendant not been a public entity....
> [G]overnment actors in their sovereign capacity and in the
> exercise of their official duties are accorded a presumption of
> good faith because they are public servants, not self-
> interested private parties. Without evidence to the contrary,
> we assume that formally announced changes to official
> governmental policy are not mere litigation posturing.[131]

The Fifth Circuit does "not require some physical or logical impossibility that the

challenged policy will be reenacted absent evidence that the voluntary cessation is a

sham for continuing possibly unlawful conduct."[132]

Plaintiffs and Intervenor-Plaintiffs have collectively alleged that every drug in

Louisiana's current protocol would result in cruel and unusual punishment, including

pentobarbital.[133] Secretary LeBlanc's sworn deposition testimony and affidavit effectively

announces that it is the policy of the Department of Public Safety and Corrections to no

longer attempt to obtain execution drugs so that may retain access to pharmaceutical

products that protect the medical needs of the inmate population. Thus, Defendants are

no longer engaging in the behavior the Plaintiffs have deemed unconstitutional in their

lawsuit allegations.

---

[130] *See Sossamon v. Lone Star State of Tex.*, 560 F. 3d 316, 324 (5th Cir. 2009).
[131] *Sossamon*, 560 F.3d at 325.
[132] *Id.*
[133] *Second Amended Complaint* ¶¶ 118, 202, 203, 204, 211, 212), hydromorphone, and midazolam (¶¶ 202, 203, 204, 211, 212).

With no evidence to the contrary, the Court assumes that Defendants' sworn declarations that DPSC has ceased efforts to obtain lethal injection drugs so that it can protect the health of all inmates is a true statement and not litigation posturing.[134] The good faith nature of Secretary LeBlanc's affidavit and the deposition testimony in this matter is reinforced by the attached documentation and the highly publicized and oft-litigated issue concerning pharmaceutical companies' unwillingness to sell their products to departments of corrections for use in capital punishment. There being no live controversy, the Court lacks subject-matter jurisdiction.

## IV. Conclusion

Defendants' *Motion to Dismiss*[135] is hereby GRANTED and Plaintiffs' claims are dismissed without prejudice.

Signed in Baton Rouge, Louisiana, this 30th day of March, 2022.

**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[134] *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 324–26 (5th Cir. 2009).
[135] R. Doc. 263.